**JOHN WOOD GROUP USA, INC.; Wood Group Drilling & Production Services Ltd.; and John Wood Group PLC, Appellants,**

**v.**

**ICO, INC., Appellee.**

**No. 01–98–00518–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

March 9, 2000.

Rehearing Overruled Aug. 31, 2000.

David W. Holman, Kevin Dubose, Levon G. Hovnatanian, Edward John O'Neill, Jr., Byron C. Keeling, Molly Duson Naylor, Houston, for appellant.

D. Gibson Walton, Marie R. Yeates, Adam Schiffer, Karen B. Jewell, Sandra Garza Rodriguez, Julie Plantes Woody, Houston, for appellee.

Panel consists of Chief Justice SCHNEIDER and Justices TAFT and PRICE.*

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.
1. NDT, a manufacturer of pipe inspection equipment, was a group of three companies owned by the Wood Group, a group of holding and operating companies whose parent

## OPINION

MICHAEL H. SCHNEIDER, Chief Justice.

The issue in this case is whether a letter agreement for the sale of millions of dollars worth of corporate assets, which stated that the essential terms of the proposed sale were "not binding," was unambiguous and nonbinding as a matter of law, or whether it presented a jury question on the issue of the parties' intent to be bound. Because we hold that there was no binding sale agreement as a matter of law, we reverse the judgment on appellee's claim for breach of a sale agreement and remand its claim for liquidated damages for further proceedings.

## FACTS

### I. The proposed sale between the Wood Group and ICO

In 1993, appellee, ICO, Inc. ("ICO"), began to explore the possibility of purchasing the assets of NDT[1] from NDT's parent companies, appellants, Wood Group Drilling & Production Services, Ltd. and John Wood Group USA, Inc. (collectively, "the Wood Group"). ICO believed that the acquisition of NDT, which manufactured pipe inspection equipment, would make ICO a dominant player in the pipe inspection services industry. At the same time, the Wood Group was in discussions with one of ICO's competitors, Tuboscope Vetco International ("Tuboscope"), regarding the sale of NDT. However, negotiations between Tuboscope and the Wood Group soon broke down, and the Wood Group continued to negotiate the sale of NDT to ICO.

company is John Wood Group PLC ("PLC"). PLC owns 100% of John Wood Group USA ("USA") and Wood Group Drilling and Production Services ("DPS"). USA held one of the three NDT companies and DPS held the other two NDT companies.

## II. The July 22, 1994 Letter Agreement

The negotiations culminated in an agreement between the parties, which was signed on July 22, 1994 ("the letter agreement" or "letter of intent"). The letter agreement contained a clause that provided:

15. *Binding Effect.* This Letter Agreement constitutes a summary of the principal terms and conditions of the understanding which has been reached regarding the sale of certain assets to Purchaser [ICO]. *It does not address all of the terms and conditions which the parties must agree upon to become binding and consummated.* The Purchaser, however, does intend to move forward with its due diligence and expects to expend considerable sums to review the Sellers' Business. In consideration therefor, the parties have agreed to make certain covenants of this letter binding upon the parties notwithstanding the fact that not all details of the transactions have been agreed upon. *Accordingly, it is understood and agreed that this letter is an expression of the parties' mutual intent and is **not binding** upon them except for the provisions of paragraphs (4), (7), (9), (10), (11), (12), (13), and (14) hereof.*

(Emphasis added).

Under this clause, all the essential terms of a sale, *i.e.*, the assets to be acquired, the purchase price, and the conditions to closing, purported to be nonbinding. However, certain other provisions, including a good faith provision, a third-party negotiation provision, and a confidentiality provision, were specifically made binding between the parties. Listed below is a description of the paragraphs included in the letter agreement and whether they purported to be binding or not binding on the parties:

| Paragraph | Subject | Whether Binding |
|---|---|---|
| 1. | Assets to be Acquired. | Not binding |
| 2. | Purchase Price. | Not binding |
| 3. | Closing. | Not binding |
| 5. | Terms of Issuance of ICO, Inc. Shares. | Not binding |
| 6. | Closing Documents. | Not binding |
| 8. | Conditions to Closing. | Not binding |
| 4. | Business of Sellers. | Binding |
| 7. | Due Diligence. | Binding |
| 9. | No Public Announcement. | Binding |
| 10. | Fees in Connection with the Transaction Contemplated in this Letter. | Binding |
| 11. | Third Party Negotiations ("No Shop"). | Binding |
| 12. | Termination Date. | Binding |
| 13. | Further Assurance ("Good Faith"). | Binding |
| 14. | Confidentiality. | Binding |

## III. The Deal Falls Through

For reasons hotly disputed by the parties at trial, the proposed sale of NDT to ICO fell through. The letter agreement provided that the sale price would be book value based upon NDT's financial statements as of May 31, 1994. However, there was apparently considerable debate as to the actual book value. ICO had proposed a reduction of the purchase price because, in performing its due diligence, it discovered what it considered to be questionable accounting principles in NDT's books. For its part, the Wood Group was concerned, among other things, about severance costs associated with NDT's president's contract.

The board of the Wood Group's parent company, PLC, subsequently disapproved the sale to ICO; the boards of the subsidiaries, USA and DPS, apparently never voted on the issue.

After the third party negotiation ("no-shop") provision of the letter agreement expired, Tuboscope reentered the picture by making an offer to purchase NDT. Soon thereafter, the Wood Group closed the deal with Tuboscope, selling NDT for approximately $4 million in cash. After Tuboscope purchased NDT, it shut NDT down.

Having lost out in its bid to purchase NDT, ICO purchased B & W Manufacturing Company, another company that manufactured pipe inspection units.

## IV. The Litigation

ICO sued the Wood Group alleging: (1) breach of the July 22, 1994 letter agree-

ment to sell NDT, and (2) fraud. After a jury trial, the jury:

(1) awarded ICO $8.5 million for breach of contract,

(2) awarded ICO $8.5 million for fraud, plus $1 million in punitive damages,

(3) found that a reasonable attorney's fee was 40% of ICO's recovery, and, alternatively found a reasonable dollar amount of attorney's fees was $3,460,500.

ICO elected to recover for breach of contract. Accordingly, the trial court entered judgment for $8.5 million in actual damages, $2,761,917 in prejudgment interest, $4,504,766 in attorney's fees (40% of ICO's recovery), plus postjudgment interest and costs. The Wood Group brings this appeal.

## BREACH OF CONTRACT

### I. Intent of the Parties—Jury Question or a Matter of Law?

In its first issue, the Wood Group argues that the trial court erred by submitting a jury question[2] regarding a breach of the letter agreement. Specifically, the Wood Group argues that the letter agreement was not a binding sale as a matter of law, and there was no question of fact to submit to the jury. ICO contends that the letter agreement was ambiguous, and, thus, presented a fact question on the issue of the parties' intent to be bound.

### A. Applicable Law

 Whether a contract is ambiguous is a question of law. *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 739 (Tex. App.—Houston [1st Dist.] 1992, writ denied). "In determining ambiguity, 'our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the instrument.'" *GTE Mo-*

2. Jury question one provided in pertinent part:

> Did Wood Group USA and/or WGDPS fail to comply with the July 22, 1994 agreement, if any, with ICO?

*bilnet of South Texas Ltd. Partnership v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 289 (Tex.App.—Houston [1st Dist.] 1997, pet. denied); *Radx Corp. v. Demy*, 658 S.W.2d 298, 301 (Tex.App.—Houston [1st Dist.] 1983, no writ). If a contract is worded so that it can be given a certain or definite legal meaning, then it is not ambiguous, and the court will construe the contract as a matter of law. *GTE Mobilnet*, 955 S.W.2d at 289; *Radx Corp.*, 658 S.W.2d at 301. If a contract is not ambiguous, a trial court errs when it submits the question of the parties' intent to the jury. *GTE Mobilnet*, 955 S.W.2d at 290.

 The intent of the parties to be bound is an essential element of an enforceable agreement and is often a question of fact. *Foreca, S.A. v. GRD Development Co., Inc.*, 758 S.W.2d 744, 746 (Tex. 1988). However, where that intent is clear and unambiguous on the face of the agreement, it may be determined as a matter of law. *Hardman v. Dault*, 2 S.W.3d 378, 380 (Tex.App.—San Antonio 1999, no pet.). Therefore, the issue this Court must decide is whether the letter agreement was unambiguously nonbinding.

### B. Texas Cases

 The leading case on whether "intent to be bound" presents a fact question or a question of law is *Foreca v. GRD Development Co., Inc.*, 758 S.W.2d 744 (Tex.1988). In *Foreca*, negotiations between the parties for the sale of six amusement park rides were held to produce a valid, enforceable contract even though the instrument executed specified that it was "subject to legal documentation." *Id.* at 745. The court noted that "[i]n some cases, of course, the court may decide, as a matter or law, that there existed no immediate intent to be bound." *Id.* at 746. However, the court held that the condition-

. . . .

| Wood Group USA | YES |
|----------------|-----|
| WGDPS | YES |

al language "subject to legal documentation" was not conclusive on the issue of intent to contract, and the resolution of the issue was properly left to the jury. *Id.*

The present case is distinguishable from *Foreca.* In *Foreca,* the proposed agreement used only conditional language, *i.e.,* "subject to legal documentation." Such language could have referred to a condition precedent to the formation of a subsequent contract, or could have been merely referencing a future memorial of an already enforceable contract. Given the two possible meanings, a finding of ambiguity is understandable. However, in this case, the parties expressly stated that the letter agreement "is not binding," with the exception of certain enumerated paragraphs. In light of the difference in the language used, we do not believe that *Foreca* compels the conclusion that the language used in this case was ambiguous.

In *Murphy v. Seabarge, Ltd.,* the letter agreement between the parties, a partnership agreement that provided for the payment of a management fee, provided it was "not intended to be a binding contract." 868 S.W.2d 929, 933 (Tex.App.—Houston [14th Dist.] 1994, writ denied). Nevertheless, the court found that a fact question on the parties' intent was properly presented to the jury. *Id.*

While the language used in *Murphy, i.e.,* "not intended to be a binding contract," is quite similar to the language used in paragraph 15 of the letter agreement in this case, we nonetheless believe that *Murphy* is distinguishable. In *Murphy,* the court found the plaintiff's actions *after* the agreement was signed were sufficient to raise a fact question. *Id.* Specifically, the partnership agreement provided that the plaintiff would be paid a minimum management fee. Despite the fact that the partnership agreement was never formalized, the court found that by beginning to pay himself the management fee provided for in the agreement, the plaintiff created a fact issue on his intent to be bound. *Id.*

In contrast, in this case, there is no issue of partial performance by either party after the letter agreement was signed to raise an issue of fact. In fact, it is the complete lack of performance that gave rise to this lawsuit. In the absence of an allegation of partial performance, we do not believe that *Murphy* compels the conclusion that the letter agreement was ambiguous.

In *Coastal Corp. v. Atlantic Richfield Co.,* 852 S.W.2d 714, 717 (Tex.App.—Corpus Christi 1993, no writ), a letter agreement for the sale of securities provided, "[n]othing in this Agreement shall be binding upon any of the parties until this Agreement is executed by all of the parties by their duly authorized officers." Because the agreement was never executed, no "written agreement" sufficient to comply with the statute of frauds ever existed. *Id.* at 717–18. The court stated that "[i]t is clear that the owners did not consider themselves to have a contract. The document memorializing the agreement expressly required that it be executed." *Id.* at 717. Accordingly, the trial court's grant of summary judgment was affirmed. *Id.* at 721.

In *RHS Interests, Inc. v. 2727 Kirby Ltd.,* 994 S.W.2d 895, 897–99 (Tex.App.—Houston [1st. Dist.] 1999, no pet.), the parties entered into an agreement that provided in part, "[t]his offer is a summary of a transaction to be more fully described in an Earnest Money Contract the specifics of which will be negotiated in good faith. This letter serves only as an offer ... and *is not binding as an agreement* unless and until a fully executed Earnest Money contract is signed." *Id.* at 897 (emphasis added). Another provision provided that the purchaser could inspect the property "prior to the execution of the binding Purchase and Sale Agreement ..." *Id.* at 899. On appeal, the appellant argued that the letter created a binding agreement. This Court disagreed, stating that the language of the agreement "shows that the parties did not yet have a deal. A

deal would be consummated only by 'the execution of the binding Purchase and Sale Agreement.' " *Id.* We also held that *Foreca* was distinguishable because the document provided a "clearer intent not to be binding than did the document in *Foreca.*" *Id.*

We believe this case is more like *RHS Interests* and *Coastal* than it is like *Foreca* or *Murphy.* In *Coastal, RHS Interests,* and the present case, the language of the letter agreements *specifically* stated that the agreements would not be binding until further actions took place. Furthermore, no issue of partial performance exists in any of these cases. Thus, neither the language of the agreement, nor the actions of the parties after the agreement, raises an issue of fact about the parties' intent to be bound.

### C. Cases from Other Jurisdictions

Cases from several other jurisdictions provide insight on whether the specific use of the term "not binding" in a letter of intent is ambiguous.

In *Feldman v. Allegheny International, Inc.,* 850 F.2d 1217, 1219 (7th Cir.1988), the parties entered into lengthy negotiations regarding the purchase of a group of food-related companies. The parties then signed a letter of intent, which provided that the parties "understood that this is not a binding agreement and the obligations and rights of the parties shall be set forth in the definitive agreement executed by the parties." *Id.* at 1221. The court, applying Illinois law, stated that "[h]aving agreed to enter into exclusive negotiations, each [party] agreed that no step of the negotiations should be interpreted by the other as a binding contract until a definitive agreement had been reached and formally executed." *Id.* The clause stating that the agreement was not binding "eliminates confusion about when a binding contract arises." *Id.* Because there was no fact question presented and the contract was not binding as a matter of law, the court affirmed a directed verdict for the defendant. *Id.* at 1226.

In *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 70 (2nd Cir.1989), the parties were negotiating the sale of a fertilizer business and entered into a letter of intent. The letter specified the purchase price, the timing and amounts of the payments, the fixed assets to be purchased, and a closing date. *Id.* However, the letter also provided that "the service and supply agreement will be negotiated and agreed to by December 31, 1986 and a binding sales agreement will be completed by December 31, 1986." *Id.* The court, applying New York law, identified five factors to consider in determining whether parties to a preliminary agreement intend to be bound: "(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Id.* at 72. The court found the first factor determinative of the parties' intent, as a matter of law. *Id.* at 72–73. Two references in the letter of intent that the negotiations might fail and the reference to a binding sales agreement to be completed at a future date showed that the parties did not intend to be bound. *Id.* at 72.

In this case, as in *Feldman,* there is a direct reference to the fact that the agreement is intended to be nonbinding. Furthermore, as in *Arcadian Phosphates,* there are several references to the fact that the negotiations might fail. For example, the introductory paragraph of the letter agreement refers to "the possible acquisition of certain assets of NDT." Paragraph 4 of the letter agreement contemplates that it could terminate before a sale was made. Paragraph 12 requires a definitive purchase agreement be executed to avoid termination of the letter agreement. Paragraph 14 provides for confidentiality of one year "if the parties are unable to reach a definitive Purchase Agreement, or if the transactions contem-

plated hereby do not close for any reason." All of these provisions, when considered with the "not binding" provision, compel the conclusion that the letter agreement was not intended to be a binding contract of sale.

### D. Policy Considerations

Letters of intent play a valuable role in conducting complex business transactions. One court described the benefits as follows:

A complex business transaction such as [a merger or sale of corporate assets] requires a significant expenditure of time, effort, research and finances simply to arrive at its terms. The books of the companies must be carefully reviewed, difficult judgment of valuation must be made, financing must be secured, new corporations may have to be formed, and various timing and risk allocation issues must be spelled out in detail in the purchase and sale contract, obviously incurring substantial legal fees.

. . . .

When a deal necessarily is preceded by costly groundwork, a letter of intent may benefit both the purchaser and the seller. Although much work remains to be done, indeed virtually all of the details remain open, the buyer secures the seller's undivided attention as long as progress continues in ironing out the points of the transaction. Neither party has committed himself to the exchange. Both have agreed to work toward it. While success is not certain, it is more likely and the fear of wasted or duplicative effort is reduced.

*Feldman,* 850 F.2d at 1221.

■■■ Thus, the basic concept of a letter of intent is to provide the parties with a way to structure their agreement without entering a binding contract. However, the use of a letter of intent is not without risk. Absent careful drafting, the parties may find themselves bound by a letter agreement that does not contain all of the protections for which they would normally negotiate or for which due diligence is incomplete. Under some circumstances, a binding contract may be formed if the parties agree on the material terms, even though they leave open other provisions for later negotiation. *See Scott v. Ingle Bros. Pac., Inc.,* 489 S.W.2d 554, 555 (Tex. 1972). Similarly, a letter of intent may be binding even though it refers to the drafting of a future, more formal agreement. *See Foreca,* 758 S.W.2d at 746.

Therefore, a party who does not wish to be prematurely bound by a letter agreement should include "a provision clearly stating that the letter is nonbinding, as such negations of liability have been held to be effective." E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.8b, at 193 (1990); *see also* 1 A. CORBIN, CORBIN ON CONTRACTS §§ 29 and 30 at 97 (1963); Andrew R. Klein, Comment, *Devil's Advocate: Salvaging the Letter of Intent,* 37 EMORY L.J. 139, 143 (1988) ("A well-drafted letter of intent should explicitly state that the parties do not intend to be bound."). The parties so provided in the present case.

### E. Conclusion—Sale Terms Not Binding

■■■ ICO's basic argument in this case is that once an agreement is reached on all principal terms, *i.e.,* the thing to be sold and the price, a legally binding sale is consummated. Thus, ICO argues that because the parties agreed on the assets to be purchased and the purchase price, a legally binding sale was reached. We acknowledge the cases holding that once the parties have reached an agreement on principal terms, a deal may be formed even though the parties leave other terms open, to be agreed upon at a later time. *See T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992) (agreement on "essential terms" necessary for contract formation). That is, nonessential terms may be supplied later if the

parties *have agreed to a sale* on the "essential terms."

However, this is not simply a case of missing terms; this case involves the more essential question of whether there was a *mutual consent* to exchange the item to be sold for the agreed upon price. A sale, in its most basic terms, includes the following elements: (1) the thing sold, which is the object of the contract; (2) the consideration or price to be paid for the thing sold; and (3) the consent of the parties to exchange the thing for the price. *See Byrd v. State*, 54 Tex.Crim. 170, 114 S.W. 135, 136 (1908).

Even though the parties in this case, through their preliminary negotiations, may have reached an agreement on the first two elements of a sale, the thing and the price, the Wood Group, by including the "non-binding" clause in paragraph 15, withheld its consent to be bound on those agreed-upon terms until a final purchase agreement was signed. Thus, the third element of a sale is missing.

In interpreting a contract, if it can be given a definite or certain meaning, the contract is not ambiguous as a matter of law. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). We believe that the term "not binding," as it is used in this letter agreement can be given a definite or certain meaning. "Not binding" in this case means exactly that, not binding. Although the parties reached a tentative agreement on the essential terms of the contract, the letter agreement specifically stated that those terms would not be binding. Fur-

thermore, there is no issue of partial performance by either party to create any ambiguity. Therefore, we conclude that the parties unambiguously expressed their intent not to be bound by the sale terms in the letter agreement. *Absent mutual consent to be bound* on the essential elements of a sale, *i.e.*, the thing to be sold and the price, there can be no sale. Because, as a matter of law, there was no contract of sale to be breached, the trial court erred by submitting jury question one.

Accordingly, we sustain appellants' first issue.

## II. Breach of Good Faith—Will it Support Benefit of the Bargain Damages?

The next issue the Court must decide is whether the breach of a binding provision—the good faith clause [3]—will support the actual damages awarded. ICO argues that even if we hold the sale provisions unenforceable, the damages must nonetheless stand because the Wood Group breached a provision of the letter agreement, specifically the good faith clause, that both parties admit was intended to be binding.

The Wood Group argues that the contract damages awarded in this case cannot stand because they are not causally related to a breach of the good faith clause of the agreement. More specifically, the Wood Group argues that the damages awarded flowed solely from the alleged breach of a contract of sale that did not exist.[4]

ICO, however, cites *Venture Associates Corp. v. Zenith Data Systems Corp.*, 96

---

3. The good faith clause provided:
 "Each of the Sellers and the Purchaser shall cooperate and work in good faith and do all acts and things as the other party may, either before or after the Closing Date, reasonably require to effectively carry out or better evidence or perfect the full intent and meaning of this Letter Agreement."

4. The jury was asked to consider the following elements of damages:
 (1) profits lost in the international market as a natural, probable, and foreseeable consequence of the Defendants'

failure to comply [with the Letter Agreement];
(2) higher costs incurred as a result of, and profits lost in the domestic market as a natural, probable, and foreseeable consequence of, Defendants' failure to comply;
(3) payment required, if any, pursuant to paragraph 11 [the no shop provision] of the agreement.
The first two elements of damages are clearly "benefit-of-the-bargain" type damages, while the third category is a liquidated damages provision provided in the

F.3d 275 (7th Cir.1996), for the proposition that the breach of a contractual good faith clause can support an award for lost benefit of the bargain damages, even if a contract is never actually entered into by the parties. *Venture Associates* involved a nonbinding letter of intent between the buyer and seller of a business, which provided, "this letter is intended to evidence the preliminary understandings which we have reached regarding the proposed transaction and our mutual intent to negotiate in good faith to enter into a definitive Purchase Agreement...." *Id.* The court, in an earlier opinion, had held that the parties "established a binding agreement to negotiate in good faith toward the formation of a contract of sale." *Id.* at 277. Having decided that the "good faith" provision was enforceable, the court went on to describe the damages available for such a breach as follows:

> Damages for breach of an agreement to negotiate may be, although they are unlikely to be, the same as the damages for breach of the final contract that the parties would have signed had it not been for the defendant's bad faith. If, quite apart from any bad faith, the negotiations would have broken down, the party led on by the other party's bad faith to persist in futile negotiations can recover only his reliance damages—the expenses he incurred by being misled, in violation of the parties' agreement to negotiate in good faith, into continuing to negotiate futilely. But if the plaintiff can prove that had it not been for the defendant's bad faith the parties would have made a final contract, then the loss of the benefit of the contract is a consequence of the defendant's bad faith, and provided that it is a foreseeable consequence, the defendant is liable for that loss—liable, that is, for the plaintiff's consequential damages.

*Venture Associates*, 96 F.3d at 278.

 However, *Venture Associates* is based on Illinois law, under which agree-

"no shop" paragraph of the letter agree-

ments to negotiate toward the formation of a contract are themselves enforceable as contracts. By contrast, under Texas law, an agreement to negotiate in the future is unenforceable, even if the agreement calls for a "good faith effort" in the negotiations. *Radford v. McNeny*, 129 Tex. 568, 104 S.W.2d 472, 474 (1937); *Maranatha Temple, Inc. v. Enterprise Prods. Co.*, 893 S.W.2d 92, 104 (Tex.App.—Houston [1st Dist.] 1994, writ denied).

ICO also argues that the good faith in this case was more than a "good faith negotiation" clause because, even if the parties had not reached a binding sale agreement at the time of the July 22 letter agreement, they subsequently reached an agreement by August 31. However, the only agreement submitted to the jury was the July 22 letter agreement referred to in jury question one. The jury was never asked to decide whether the parties subsequently reached an agreement. Accordingly, we believe that the good faith clause in this case is, like the clause in *Maranatha Temple*, nothing more than a promise to negotiate in good faith.

Furthermore, we believe the terms of the "good faith" clause in this case are too vague to be enforceable as a contractual obligation. In *Richter v. Bank of America National Trust and Savings Association*, 939 F.2d 1176 (5th Cir.1991), the court, applying Texas law, considered whether an alleged oral agreement with a bank to negotiate in good faith toward a reasonable restructure of the plaintiff's debt was an enforceable agreement. *Id.* at 1196. The plaintiffs did not argue that the bank had agreed to a specific outcome of the negotiations; instead, they argued that the bank agreed to negotiate in good faith, regardless of the outcome. *Id.* They argued that the subject matter of the oral good faith agreement was the method of the negotiation, not the result of the nego-

ment.

tiation. *Id.* The court held that the agreement to negotiate in good faith was too indefinite to enforce because it did not discuss the relevant terms of the agreement such as the duration, the parties' obligations, or what a "reasonable" restructure of the loan would be. *Id.*

■ We believe that the "good faith" provision in this case is similarly vague. It requires the parties to do "all acts and things as the other party . . . may reasonably require." There is no discussion of what sort of "acts and things" to which such clause refers. "If an alleged agreement is so indefinite as to make it impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract." *University Nat'l Bank v. Ernst & Whinney,* 773 S.W.2d 707, 710 (Tex.App.—San Antonio 1989, no writ); *see also Moore v. Dilworth,* 142 Tex. 538, 179 S.W.2d 940, 942 (1944).

■ We believe that the good faith clause contained in the purported letter agreement is superfluous, in that it does no more than reiterate the duty of good faith that is expressed in TEX. BUS. & COM. CODE § 1.203 (Vernon 1994), which provides, "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." The supreme court has stated:

> [t]his section does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power.

5. The "no shop" or third party negotiations clause of the letter agreement provided:
> The undersigned agree that neither they nor any of their officers, directors, employees or agents will enter into or conduct any discussions or negotiations relating to the sale or possible sale of any

*Northern Nat. Gas Co. v. Conoco, Inc.,* 986 S.W.2d 603, 606 (Tex.1998). The court in *Northern Natural Gas* held that absent a specific duty or obligation to which the good faith standard could be tied, no damages for a violation of the good faith statute would stand. *Id.* at 606–07. Because the agreement at issue in the *Northern Natural Gas* case did not impose a duty on the defendant to continue to maintain certain gas purchase contracts, its cancellation of those contracts would not be actionable, despite the good faith standard implied by section 1.203. *Id.*

Even though the good faith provision in this case springs from the parties' agreement to be bound, rather than merely being implied by section 1.203, we believe that, in its vagueness, it does nothing more than restate section 1.203; it does not create any new obligations. Therefore, for a breach of the good faith provision to give rise to damages, it must otherwise be tied to another obligation created by the letter agreement. We have already held that the July 22 letter agreement did not create any obligation for the Wood Group to sell NDT to ICO, and no other agreement was submitted to the jury. Therefore, ICO's claim for benefit of the bargain damages as a resulting from any breach of the good faith provision cannot stand.

### III. Breach of "No Shop" Clause and Confidentiality Clause

#### A. Benefit of the Bargain Damages?

■ Next, we must consider whether ICO is entitled to recover benefit of the bargain damages for a breach of either the "no shop" clause or the confidentiality clause, both of which were contained in the letter agreement, and which both parties agree were binding.[5]

> Sellers' assets (other than in the ordinary course of business) or the shares of common stock of any of the Seller companies, or solicit proposals for the purchase of any such assets or stock, for a period of two (2) months following the execution of this Letter Agreement, unless 1 payment

ICO argues that the breach of these provisions will support an award for lost benefit of the bargain damages, but provides no authority for this assertion. Indeed, it is difficult to see how a breach of these provisions could result in the exact damages that would occur if a binding agreement had been reached. Absent some authority to the contrary, we hold that benefit of the bargain damages are not available for a breach of the "no shop" provision or the confidentiality provision.

### B. Liquidated Damages

■ Jury question three, which was the damages question, asked the jury to consider three elements of damages: (1) lost profits in the international market, (2) lost profits in the domestic market, and (3) payment required, if any, under the "no shop" provision in paragraph 11 (which would be $500,000). After considering these elements, the jury found $2 million in past damages and $6.5 million in future damages for the breach of contract claim. The first two elements of damages, lost profits in the international and domestic markets, are clearly "benefit of the bargain" type damages. Because we have held that there was no binding letter agreement, the trial court erred by submitting a jury question that included the first two elements of damages. However, the third element of damages, a liquidated damages provision under the "no shop" provision of the letter agreement, would arguably be available to ICO if the jury found that the "no shop" provision had been violated.

However, because the "no shop" provision of the letter agreement was submitted to the jury along with the purported sales agreement, we are unable to determine whether the jury found a violation of the "no shop" clause or whether ICO was entitled to recover the liquidated damages provided for in paragraph 11. Accordingly, we reverse and remand ICO's claim for breach of the "no shop" provision and liquidated damages under paragraph 11 for further proceedings.

### IV. Summary

We hold that, as a matter of law, there was no binding contract of sale between the parties. We further hold that a breach of the binding provisions contained in the purported letter agreement—the good faith clause, the "no shop" clause, and the confidentiality clause—will not support an award of benefit of the bargain damages. Therefore, the trial court erred by submitting the first two elements of breach of contract damages, *i.e.*, the benefit of the bargain damages, to the jury.

### FRAUDULENT INDUCEMENT OF CONTRACT

■ ICO also pled fraud as an alternative theory of recovery in this case, and fraud questions were submitted to the jury. The jury found that the Wood Group had committed fraud and awarded $1.5 million for damages sustained in the past, $6.5 million for damages that would in reasonable probability be sustained in the future, and $1 million in punitive damages. Nevertheless, ICO elected to recover on its breach of contract case. However, on appeal, ICO argues that if we determine that the breach of contract damages were improper, we should nonetheless allow them to recover under their fraud theory. The Wood Group argues that, like the breach of contract damages,

in the amount of $500,000 is made to Purchaser.

The confidentiality clause provided:

The parties hereby agree, for themselves and their respective officers, directors, employees, and agents, to maintain the confidentiality of this Letter Agreement and all of its terms and conditions, except to the extent required for purposes of due diligence and the consummation of the transactions described herein. If the parties are unable to reach a definitive Purchase Agreement, or if the transactions contemplated hereby do not close for any reason, the parties agree that the covenants contained in this paragraph (14) shall continue in effect for a period of (1) year following the date hereof.

**24**

the fraud damages also fail as a matter of law.

ICO argues that they were fraudulently induced into entering the letter agreement by the Wood Group's false representations that it would agree to sell NDT for book value, while intending to extract a higher price from ICO.

However, ICO's entire argument is based on the false premise that the letter agreement was a binding contract of sale. As we held earlier, it was not.

In *Coastal Corp. v. Atlantic Richfield Co.*, the parties entered into a nonbinding letter agreement for the sale of securities. 852 S.W.2d at 717. On appeal, the prospective buyer argued that the prospective seller had fraudulently induced it into entering the "contract." *Id.* at 720. The court held that because the buyer never entered into a binding contract with the seller, it could not have relied on any misrepresentations to its detriment. *Id.* In so holding, the court stated:

> Where false representations or promises are made to induce another to act, and, before such other does act, he learns of the falsity of such representations or promises, it cannot of course be said that he relied upon them believing them to be true, for knowing of their falsity, he has not been deceived.

*Id.* (*quoting Thrower v. Brownlee*, 12 S.W.2d 184, 186–87 (Tex.Comm.App.1929)).

Even if we were to agree that the Wood Group falsely induced ICO to enter into the letter agreement in order to extract a higher sale price, ICO never entered into a binding sale based on any alleged false representation, *i.e.*, ICO never undertook an obligation to pay *any* purchase price, much less an inflated one. Because, as a matter of law, ICO was not fraudulently induced to enter into a binding sales agreement, the fraud damages based on the failure of that alleged sale cannot stand.

**CONCLUSION**

We reverse the breach of contract damages and render judgment that ICO take nothing on its claims for breach of the purported sale, breach of the good faith clause, or breach of the confidentiality clause. Also, we reverse the breach of contract damages awarded in connection with the breach of the "no shop" clause and remand the case for the limited purpose of determining ICO's entitlement to liquidated damages, if any, under the "no shop" clause.