Affirmed and Memorandum Opinion filed July 27, 2004









Affirmed and Memorandum Opinion filed July 27, 2004.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-01392-CV

____________

 

WILLIAM J.
McMILLAN,
Appellant

 

V.

 

HILLMAN
INTERNATIONAL BRANDS, LTD., HILLMAN DISTRIBUTING COMPANY, and M. H. AHAL@
HILLMAN,
Appellees

 



 

On Appeal from the 80th
District Court

Harris County, Texas

Trial Court Cause No. 02-58122

 



 

M E M O R A N D U M   O P I N I O N








William J. McMillan, (ABill@), appeals from
the grant of traditional and no-evidence summary judgment motions in favor of
appellees, Hillman International Brands, LTD., (AHIB@), Hillman
Distributing Company, and Mr. M. H. AHal@ Hillman.  Alleging an agreement to purchase HIB for $20
million, Bill asserts that Hal fraudulently entered into this purchase agreement
with no intention of consummating the sale. Bill pleaded damages of at least
$40 million under the benefit-of-the-bargain rule and of at least $80 million
in exemplary damages. On appeal, Bill contends the trial court erred in
granting appellees= traditional motion for summary judgment,
in granting appellees= no-evidence motion for summary judgment,
and in denying his motion for summary judgment. 
We affirm.

HIB is a limited partnership organized to
distribute a number of beer brands in Harris County.  Accordingly, HIB was composed of a limited
partner, Barksdale, White & White, Inc., and a general partner, the Hillman
Distributing Company (AHDC@).  HIB was primarily owned and operated by the
Hillman family.  Hal was the president
and chairman of HDC.  Hal=s son, Robert
Michael Hillman (AMike@) was HIB=s chief executive
officer and a HDC board member.  

Bill began working as HIB=s general manager
in 1998.  In response to a changing
market, the Hillman family began to consider selling HIB.  Bill approached Mike about the possibility of
buying HIB and running it with existing employees.  In March 2000, Bill, Hal, Mike, and Joe
Polichino, who was the director of marketing for HIB and executive vice
president of Barksdale, White & White, met to discuss the sale of HIB.  Several weeks later, Mike prepared a letter
memorializing this meeting.  The
document, which appears to be in the form of a letter, was dated April 11, 2000
and was signed by Bill, Hal, Mike, and Joe. 
It reads, in pertinent part:

In today=s business world any company is for sale at the
right price.  HIB, Ltd is no
exception.  This has actually been true
all along.  Having said that I want to go
one step further and say the time has come for the Hillman family to exit this
business that has been our livelihood for all these years.  There are a number of reasons why I=ve come to this conclusion which I won=t go into, but they are compelling enough for me to
make this very difficult decision.

It is my desire that we sell to Bill McMillan and we
will work with him every way we can to make that happen.  We do have a value in mind and hopefully we
can reach a workable agreement.  I
earnestly believe there is great potential to grow our brands in this market
for whoever takes this portfolio into the future.  That growth will easily pay for the fair
price we are asking for the company.

I am in support of the recommended personnel changes
advocated by you and agree with your timetable for implementation.








I am very proud of my top management team.  You have done a truly admirable job and I
will expect that to continue regardless of what might happen.  I have great confidence in all of you that we
can continue to build on past success and take this company to new heights.

You have my sincere gratitude for a job well done
and I will expect the standard of excellence established by your leadership to
continue come what may.

Bill contacted a consultant to assist him
in purchasing HIB.  There is no
explanation in the record as to how this consultant would be paid if Bill was
successful in acquiring HIB.  The
consultant eventually withdrew his services, and HIB was sold to an unrelated
company for $38.5 million.  Bill
thereafter initiated this suit for fraud. 


Bill contends that the written Aagreement@ of April 11,
together with an oral statement that HIB would be sold for $20  million, created an enforceable contract.
Specifically, Bill asserts that appellees made fraudulent representations with
respect to the sale of HIB and never intended to sell HIB to Bill.  In response, appellees asserted in their
first amended original answer that no enforceable contract was formed.  They described the document as merely an
agreement to negotiate; moreover, appellees argued that the document failed as
an enforceable contract because it lacked essential terms to evidence a meeting
of the minds, lacked consideration, and violated the Statue of Frauds.  Additionally, appellees asserted that
benefit-of-the-bargain damages were not available when the underlying contract
is unenforceable and that Bill had waived any recovery under the alleged
agreement.[1]  








Multiple motions for summary judgment were
filed by the parties.  Bill filed his
motion for summary judgment on April 17, 2003. 
Appellees filed a traditional motion for summary judgment on May 1,
2003.   The trial court denied Bill=s motion for
summary judgment by written order on September 2, 2003.  Subsequently, appellees filed a no-evidence
motion for summary judgment on October 28, 2003.  In their traditional motion for summary
judgment, appellees presented multiple legal theories that would prevent the
formation of an enforceable contract.  In
addition to those defenses set forth in appellee=s amended answer,
appellees described the April 11document not as evidence of a contract, but of
an unenforceable expression of expectation. 
Through their no-evidence motion for summary judgment motion, appellees
requested that Bill produce competent summary judgment evidence to raise an
issue of fact on the elements of his claim. 
After considering both of appellees= motions, the
trial court issued a written order granting appellees= motions on
December 1, 2003.








Although the trial court granted both
motions for summary judgment, we analyze the grant of the no-evidence summary
judgment first.  Ford Motor Co. v.
Ridgway, No. 02-0552, 2004 WL 250898, at *1(Tex. Feb. 6, 2004).  If Bill did not produce summary judgment
evidence raising an issue of material fact as required by Rule of Civil
Procedure 166a(i), it is unnecessary for us to consider whether appellees= traditional
motion for summary judgment was properly granted.  Id. (contrasting the different burdens
under Rule 166a(c) and (i)).   In
evaluating whether the no-evidence summary judgment was properly granted, we
need only consider the evidence presented in the nonmovant=s response.  See Saenz v. S. Union Gas Co., 999 S.W.2d 490, 494 (Tex. App.CEl Paso 1999, pet. denied) (holding that
Rule 166a(i) requires the court to look only at the evidence produced in the
nonmovant=s response to the present motion and not
at other evidence produced in response to a previous no-evidence summary
judgment motion that may be in the court=s file).  

 The
proponent of a no-evidence motion for summary judgment asserts there is no
evidence of one or more essential elements of claims upon which the opposing
party would have the burden of proof at trial. 
See Tex. R. Civ. P. 166a(i);  McCombs v. Children's Med. Ctr., 1
S.W.3d 256, 258 (Tex. App.CTexarkana 1999, no
pet.).  Unlike a movant for traditional
summary judgment, a movant for a no‑evidence summary judgment does not
bear the burden of establishing a right to judgment by proving each claim or
defense.  See Holmstrom v. Lee, 26
S.W.3d 526, 530 (Tex.
App.CAustin 2000, no pet.).  A no‑evidence summary judgment is
essentially a pretrial directed verdict, to which we apply the same legal
sufficiency standard of review.  See
id.; Moore v. K Mart Corp., 981 S.W.2d 266, 269 (Tex. App.CSan Antonio 1998,
pet. denied).  A no‑evidence
summary judgment is properly granted if the nonmovant fails to produce more
than a scintilla of probative evidence raising a genuine issue of fact as to an
essential element of a claim on which the nonmovant would have the burden of
proof at trial.  See Tex. R. Civ. P. 166a(i);  Holmstrom, 26 S.W.3d at 530.  When both parties move for summary judgment
and the trial court grants one motion and denies the other, the reviewing court
reviews both parties= summary judgment evidence and determines
all questions presented.  Bradley v.
State ex rel. White, 990 S.W.2d 245, 247 (Tex. 1999).  The reviewing court renders the judgment that
should have been rendered by the trial court. Id.  








In asserting a fraud claim, Bill was
required to prove that (1) appellees made material misrepresentation to him,
(2) the representation was false, (3) when appellees made the representation,
they knew it was false or made it recklessly without any knowledge of the truth
and as a positive assertion, (4) appellees made the representation with the
intention that Bill act upon it, (5) Bill acted in reliance upon the
representation, and (6) Bill suffered injury. 
Beal Bank, S.S.B v. Schleider, 124 S.W.3d 640, 647 (Tex. App.CHouston [14th Dist.] 2003, pet.
denied) (citing Johnson & Higgins v. Kenneco Energy, Inc., 962 S.W.2d 507, 524 (Tex.
1998)).  The alleged agreement to sell
HIB to Bill is best described as a future promise to act.  Bill=s alleged future
promise to act Aconstitutes fraud only when made with the
intent to deceive and with no intention of performing the act.@  Beal Bank, 124 S.W.3d at 647.  Additionally, by pleading for
benefit-of-the-bargain damages, Bill must also prove that this promise to sell
HIB is itself enforceable as a contract. 
See Haase v. Glazner, 62 S.W.3d 795, 799-800 (Tex. 2001) (holding
that a plaintiff cannot use a fraud claim to enforce an otherwise unenforceable
contract).[2]  

After reviewing Bill=s response to the
no-evidence summary judgment motion, we hold he produced no evidence of an
enforceable contract.  The material terms
of a contract must be agreed upon before it may be enforced.  T.O. Stanley Boot Co., Inc. v. Bank of El
Paso, 847 S.W.2d 218, 221 (Tex. 1992). 
The material terms in a contract for sale necessarily include: (1)
identification of the property being sold, (2) the consideration or price paid
for the property, and (3) the parties= consent to
exchange the property for the agreed price. John Wood Group USA, Inc. v.
ICO, Inc., 26 S.W.3d 12, 20 (Tex. App.CHouston [1st Dist.] 2000, pet. denied).   No binding contract is formed where material
terms are open for future negotiation.  T.O.
Stanley Boot, 847 S.W.2d at 221.  








In his response to appellees= motion for
summary judgment, Bill presents no evidence that identifies what property is
actually for sale.  In fact, the summary
judgment proof does not define what property was being sold under the  alleged agreement.  Still to be resolved were such issues as
whether the sale would include a leasehold interest in a warehouse, company
stock, other hard assets, or merely the distributorship rights.  Bill alleges that the binding contract was
partly oral and partly written; the enforceable contract was created through
the April 11, 2000 document and an oral representation that HIB would be sold for
$20 million.  However, the alleged oral
representation that HIB would be sold for $20 million does not answer Awhat@ would be
sold.  Likewise, the April 11, 2000
document does not provide these material terms.[3]  At best, the document conveys a hope for
future negotiations.

Similarly, the other evidence supplied by
Bill in his response supports the proposition that the parties were only beginning
to negotiate and had not identified what would be sold.  For example, the consultant, who was retaind
by Bill to assist in the purchase, expressed this specific concern in his
engagement letter.  In this letter, dated
May 3, 2000, the consultant notes, ABill, before we
begin this most important project, it is also crucial to know (1) specifically
what markets and assets we are making an effort to acquire and (2) specifically
what purchase price, terms and conditions are anticipated by the shareholders
of Hillman.@ 








An agreement to negotiate toward the
formation of a contract is unenforceable. 
John Wood Group USA, 26 S.W.3d at 21(including those instances where the
agreement calls for a A>good faith effort=@ in the negotiations).  Without an enforceable contract, Bill cannot
survive summary judgment when he seeks benefit-of-the-bargain damages.  Haase, 62 S.W.3d at 799-800.  We overrule appellant=s point of error
and affirm the grant of the no-evidence summary judgment motion;
accordingly,  we need not consider Bill=s point of error
related to the traditional motion for summary judgment.  See Ridgway, 2004 WL 250898, at
*1.  

In Bill=s remaining point
of error he contends the trial court erred in denying his motion for summary
judgment.  Bill alleged in his motion for
summary judgment that the parties had entered into an enforceable agreement.  As a movant for summary judgment, Bill has
the burden to show that no genuine issue of material fact exists and that he is
entitled to judgment as a matter of law. 
Tex. R. Civ. P. 166a(c); Lear
Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex. 1991).  However, after reviewing his summary judgment
evidence, which consists of the same evidence produced in his response to
appellees= no-evidence motion for summary judgment,
we come to the same conclusion that we did in our analysis of appellees= no-evidence
motion for summary judgmentCno enforceable
contract was formed.     Thus, we must
overrule Bill=s final point of error.

The judgment of the trial court is
affirmed.  

 

 

 

/s/      J. Harvey Hudson

Justice

 

 

 

Judgment
rendered and Memorandum Opinion filed July 27, 2004.

Panel
consists of Justices Yates, Anderson, and Hudson.











[1]  Although we do
not address the issue of waiver in this opinion, it appears Bill acknowledged
he would not able to purchase HIB and was interested in a receiving a portion
of the sale price.  In a letter to Hal,
Mike, and Joe, which is dated January 15, 2002, Bill stated:

Shortly after I came to work for Hillman International Brands Mr.
Hillman, Mike Hillman, Joe Polichino and I met. 
We mutually agreed to grant me the right to purchase the HIB franchise
when it became available.  We signed an
agreement to that affect which was placed in a safe for future
consideration.  During the past four
years the subject came up from time to time but never materialized

The dynamics of the industry changed during this year and obviously has
made it more feasible to sell to a strategic buyer.  As talks began with the current buyer, an
agreement was made to pay me 5% or approximately $2,000,000 of the selling
price.  I accepted that offer and I
understand it has been discussed with certain members of the General and
Limited Partnerships.  I have always
wanted what is best for the company therefore this arrangement is acceptable. 





[2]  In Haase,
the supreme court discussed the difference between fraud and fraudulent
inducement claims with regard to damages. 
While proof of an enforceable contract is required for a fraudulent
inducement claim, an enforceable contract is not always required for a fraud
claim.  Haase, 62 S.W.3d at
800.  The plaintiff in Haase
brought suit for breach of contract, fraud, fraudulent inducement, and unjust
enrichment.   Id. at 796.  Additionally, plaintiff alleged both
benefit-of-the-bargain damages and out-of-pocket damages.  Id. 
In rendering a take-nothing judgment on plaintiff=s fraud and fraudulent inducement claims for
benefit-of-the-bargain damages, the supreme court explained that the award of
benefit-of-the-bargain damages would allow plaintiff to enforce a contract that
was barred by the Statute of Frauds.  Id.
at 799.  Alternatively, plaintiff=s out-of-pocket damages arising out of the fraud claim
would not necessarily be barred as they are independent of any alleged
contractual agreement.  Id. at
799-800.  Unlike in Haase, where
the plaintiff alleged that he A>made efforts concerning demographics, decor, potential
profits, and location,=@ Bill alleges no out-of-pocket damages in his
petition.  See id.  





[3]  Although Bill
argues that it was clear that he was only purchasing Athe brands,@ we note
that there is evidence that Bill was unsure as to what he was purchasing.  Attached to appellees= response to Bill=s motion
for summary judgment is Bill=s deposition testimony that provides:

Q. What is
Athe company@?  When you say Athe
company,@ what are you talking about?

A. Talking
about Hillman International Brands.

Q.
Composed of Hillman Distributing Company and its limited partner?

A. I can=t tell you that. 
I know that the representation here is what I am telling you that I had
thought it to be, what I interpreted it to be.

Q. So you
thought you had a first option to purchase not only the hard assets on Seamist,
but also all the brands?

A. The
brands, yes, sir.

Q. As well
as the hard assets on Seamist?

A. The
hard assets, I=m not sure about. 
I can=t tell you that. 
I=m telling you what was represented to me, that you
will have the opportunity to buy this company as it says.

When questioned about the structure of the sale, he
did not know whether he was purchasing company stock or acquiring company
assets.  Curiously, Bill=s own deposition testimony was not attached to either
his motion for summary judgment or his response to appellant=s no-evidence motion for summary judgment.