Opinion issued November 5, 2009













In The
Court of Appeals
For The
First District of Texas




NOS. 01-09-00030-CV & 01-09-00111-CV




STEWART & STEVENSON, LLC & MTU DETROIT DIESEL, INC.,
appellants

v.

GALVESTON PARTY BOATS, INC. & BOAT SERVICE OF
GALVESTON, INC., appellees

IN RE STEWART & STEVENSON, LLC & MTU DETROIT DIESEL, INC.,
relators




On Appeal from the 405th District Court
Galveston County, Texas
Trial Court Cause No. 08CV0011




MEMORANDUM OPINION

          This is a consolidated interlocutory appeal and petition for writ of mandamus
challenging the trial court’s December 17, 2008 order denying a motion to compel
arbitration filed by relators/appellants Stewart & Stevenson, LLC and MTU Detroit
Diesel, Inc. (collectively, “Stewart & Stevenson”).


 The lawsuit arose when real
parties in interest/appellees, Galveston Party Boats, Inc. and Boat Service of
Galveston, Inc. (collectively, “GPB”), discovered that six marine engines
manufactured by MTU Detroit Diesel and sold by Stewart & Stevenson were faulty
and sued for recovery. In three issues, Stewart & Stevenson argues that the trial court
abused its discretion (1) by denying the motion to compel arbitration; (2) by failing
to hold an evidentiary hearing on the motion to compel arbitration; and (3) by
allowing the use of inadmissible evidence to support GPB’s response to the motion
to compel arbitration.
          We dismiss the interlocutory appeal for lack of jurisdiction and deny the
petition for writ of mandamus.
Background
          Stewart & Stevenson, a provider of parts and repair services, and GPB, a
provider of boating services, first started doing business together at the end of 2000. 
In 2004, GPB became involved in a program through which the Texas Commission
on Environmental Quality (“TCEQ”) would subsidize a private business’s purchases
of low-emission diesel engines with grant money. GPB entered into negotiations with
TCEQ, filing a grant application in March 2004 to obtain funding for engines GPB 
would purchase through Stewart & Stevenson.
          In the course of these negotiations, on August 13, 2004, GPB provided notice
to TCEQ of the assignment to Stewart & Stevenson of its payments under their
prospective contract 
for reimbursement of the eligible incremental costs of the purchase or
lease of four main engines and two generators on the New Buccaneer
and two main engines and one generator on the Cavalier from the
Assignee under a grant contract that may be executed between
Galveston Party Boats, Inc. and the TCEQ for award of an Emissions
Reduction Incentive Program Grant in response to grant application
dated March 11, 2004.
 
The notice stated, “If a grant is awarded for the reimbursement of the above-listed
expenses, and upon our submission of the required reimbursement request forms,
please forward the payments to the Assignee.”
          On August 25, 2004, GPB entered into an agreement with TCEQ under which
TCEQ agreed to reimburse GPB for up to $445,350 toward the expense of replacing
its old engines with new, lower-emissions engines, provided that GPB met TCEQ
conditions. The contract between TCEQ and GPB stated:
Subject to approval by the TCEQ, the PERFORMING PARTY [GPB]
may assign the payments due from the TCEQ directly to the supplier,
subcontractor, financing or leasing company, or other entity from which
the goods or services were procured, leased, or financed by the
PERFORMING PARTY. . . .
 
Under this option, the Grant Equipment and/or goods and services
included under a cost must have been received and accepted by the
PERFORMING PARTY, and the PERFORMING PARTY must have an
obligation to pay the expense. Sufficient supporting documentation
must be submitted, as outlined in the form instructions, to document that
the goods or services were received and that the payment amount is
owed to the entity designated to receive the payment from the state.
 
Performance of this agreement was made contingent on TCEQ’s receiving the funds
necessary to cover the grant.
          In mid September 2004, TCEQ issued a Notice to Proceed to GPB, listing the
contract amount at $445,350. The notice stated:
The Texas Commission on Environmental Quality (TCEQ) executed
contract number 582-4-65615-0120 on August 25, 2004, contingent
upon the TCEQ receiving sufficient funds to cover the grant and issuing
a Notice to Proceed. We have now received the funds for this contract. 
Per Article 5, Grant Agreement, of the contract, TCEQ hereby provides
the PERFORMING PARTY with a Notice to Proceed for the activities
described in the above-noted contract. The PERFORMING PARTY
may now proceed with any unfinished activities described in the
contract, and may also submit a Request for Reimbursement for contract
activities completed to date.
 
On September 22, 2004, Stewart & Stevenson sent a sales quote letter to GPB listing
the specifications for the engines and other products to be sold. The letter stated:
We are pleased to inform you that the [TCEQ] has approved your
application for a grant in the amount of $445,350.00. . . . Should you
have any questions about your grant, please feel free to contact me
personally.
 
The total cost of the project is $587,626.00; Emission Reduction
Specialist was able to submit the cost effectiveness amount of
$528,800.00 to the TCEQ and the state awarded a reimbursement of
$445,350.00. Galveston Party Boats, Inc. is responsible for the
difference between the project amount and the reimbursement from
TCEQ which totals $142,276.00; any amount above and beyond the
$587,626.00 for this project will be the responsibility of Galveston Party
Boats.
 
The letter then listed a quote for the cost of the engines, generators, and labor to
install them. The letter concludes:
Note: This price includes the cost to buy back the cores to be scrapped
as per TCEQ contract.
 
Terms and conditions are attached.
Total invoice net 30 days after engines have been delivered to shipyard
with approved credit from Stewart & Stevenson credit department.
 
The letter is signed by Mark Wooten as a customer support representative of Stewart
& Stevenson. There are no attached terms and conditions in the record.
          On April 12, 2005, GPB’s M/V Cavalier departed on its first voyage with the 
two new engines delivered and installed by Stewart & Stevenson. On May 17, 2005,
four new engines were installed in the M/V New Buccaneer.
          On August 17, 2005, GPB paid a $60,006 down payment to Stewart &
Stevenson based on the estimated amount that would be left owing after Stewart &
Stevenson received, as assignee, funds from TCEQ. TCEQ paid money to Stewart
& Stevenson for the portion of engines paid for by the grant.
          Stewart & Stevenson provided a series of invoices reflecting these transactions. 
In an invoice dated February 15, 2005, Stewart & Stevenson accounted for the verbal
sale for the first two engines and noted that they were shipped on February 7, 2005. 
In two subsequent invoices reflecting the same verbal sale of the first two engines,
both dated January 17, 2006, Stewart & Stevenson also accounted for an order for
extended warranties


 and catalogs and a commission/consultant fee “paid to emission
reduction specialist.”
          The remaining four engines were accounted for in an invoice dated April 26,
2005, which noted that the final four engines were shipped on April 21, 2005. Again,
there are additional invoices dated January 17, 2006 for these same four engines that
also include a 5% commission/consultant fee “paid to emission reduction specialist.”


 
All of these invoices contained a statement of Stewart & Stevenson’s terms and
conditions.
          Each of the multiple invoices involved in the transaction states on its front:
“THE SALE EVIDENCED BY THIS INVOICE IS SUBJECT TO THE TERMS
AND CONDITIONS ON THE FRONT AND REVERSE SIDE OF THIS
DOCUMENT.” On the back of each invoice, there was an arbitration provision:
ARBITRATION: Any dispute arising from or relating to the sale of
Goods or Services, including the interpretation of these General Terms
and Conditions of Sale, shall be resolved by binding arbitration
according to the Stewart & Stevenson Arbitration Program.
 
The invoice also provided the following definitions as part of its terms and
conditions:
[A]s used in these General Terms and Conditions of Sale, the term
“Goods” shall mean the machinery, equipment, products and other
tangible property from time to time sold or offered for sale by Seller; the
term “services” shall mean the labor from time to time provided by
Seller; the term “Seller” shall mean the entity selling or offering such
Goods or Services; and the term “Buyer” shall mean the person to whom
such Goods and Services is sold or offered.
 
          Stewart & Stevenson argues that no one at GPB ever objected to the arbitration
provision’s inclusion in the invoices’ terms and conditions. However, GPB argued
that it did not receive all of these invoices on the dates listed. It argues that Stewart
& Stevenson fraudulently created the invoices on January 17, 2006, ten months after
the engines were installed, to reflect the sales and deliveries that had already
occurred. GPB argues that it received the invoices in January 2006 and then signed
a hand-written agreement with Stewart & Stevenson on January 31, 2006.
          The hand-written January 31, 2006 agreement between GPB and Stewart &
Stevenson reflects that the total invoiced amount was $505,356. It also reflects
credits for GPB’s $60,006 down payment, a $25,268 “ERS Fee,” and another
payment of $331,884, apparently from the TCEQ reimbursement. This document
states that $88,198 is due to Stewart & Stevenson and that $113,466 has been paid
to GPB, but it does not designate who paid GPB that amount. This hand-written
document was signed by representatives of both parties.
          GPB alleges that it began experiencing “serious complications leading to
ongoing catastrophic failures of the new engines” just a few weeks after the engines
were installed. GPB had the engines serviced several times by Stewart & Stevenson,
resulting in multiple warranty claims from GPB to MTU Detroit Diesel for payment
on warranty work and in GPB’s incurring other expenses related to remediating
engine failures. The service work performed by Stewart & Stevenson was also
invoiced on documents containing the same arbitration provision already discussed.
          GPB eventually filed a lawsuit in the trial court against Stewart & Stevenson,
MTU Detroit Diesel, and other manufacturers of the engines’ components. GPB’s
petition alleged causes of action for fraud, conspiracy to commit fraud, fraudulent
inducement, breach of the implied warranty of merchantability and breach of implied
warranty of good and workmanlike repair, negligence, negligent misrepresentation,
and DTPA violations.
          Stewart & Stevenson filed a motion to compel arbitration on August 1, 2008,
arguing that the arbitration provision in the invoices required GPB to arbitrate its
claims against Stewart & Stevenson and MTU Detroit Diesel. Stewart & Stevenson
also argued that its eight-year relationship with GPB represented a course of dealing
that “should defeat any argument that [GPB] [was] ‘unaware’ of the provision” in the
invoices and that GPB ratified the arbitration provision in the invoices by accepting
the engines and services invoiced. Stewart & Stevenson also filed a motion to
transfer venue. 
          In the course of this litigation, Stewart & Stevenson provided the terms of its
Arbitration Program referenced on the invoices. The Arbitration Program provides:
Upon the request of any party, whether made before or after the
institution of any legal proceeding, any action, dispute, claim or
controversy of any kind (e.g., whether in contract or in tort, statutory or
common law, legal or equitable) now existing or hereafter arising
between the parties in any way arising out of, pertaining to or in
connection with (1) the agreement, document or instrument to which this
Arbitration Program is attached or in which it is incorporated by
reference, or any related agreements, documents, or instruments (the
“Documents”), (2) any incidents, omissions, acts, practices, or
occurrences causing injury to either party whereby the other party or its
agents, employees or representatives may be liable, in whole or in part,
or (3) any aspect of the past or present relationships of the parties, shall
be resolved by binding arbitration in accordance with the terms of this
Arbitration Program. The foregoing matters shall be collectively
referred to as a “Dispute.” Any party to this Arbitration Program may,
by summary proceedings bring an action in court to compel arbitration
of any Dispute.
 
. . . .
 
A Dispute between the parties shall be resolved by binding arbitration
administered by the American Arbitration Association (the “AAA”) in
accordance with the terms of this Arbitration Program, the Commercial
Arbitration Rules of the AAA, and, to the maximum extent applicable,
the Federal Arbitration Act (Title 9 of the United States Code). In the
event of any inconsistency between this Arbitration Program and the
statute and rules, this Arbitration Program shall control. Judgment upon
the award rendered by the arbitrators may be rendered by any court
having jurisdiction.
 
GPB maintains that it did not receive a copy of Stewart & Stevenson’s Arbitration
Program until after this dispute arose.
          On September 9, 2008, GPB filed its combined “Motion for Partial Summary
Judgment; Objection and Response to Motion to Compel Arbitration; and Objection
and Response to Amended Motion to Transfer Venue.” It argued that Stewart & 
Stevenson’s attempts to enforce the “Terms and Conditions” in the invoices were
invalid as a matter of law because there was no valid contract containing an
arbitration provision. It argued that the transaction was governed by the contract
between it and the TCEQ and that it had entered into a verbal agreement with Stewart
& Stevenson for the sale of the engines before any of the invoices were ever sent and
that no additional consideration was exchanged other than that agreed upon in the
verbal agreement.
          Without holding a hearing, the trial court signed its order denying Stewart &
Stevenson’s motion to compel arbitration on December 17, 2008. In its order, the
trial court
ORDERED, ADJUDGED AND DECREED that the terms and
conditions located on the reverse of invoices created by Stewart &
Stevenson are hereby unenforceable in their entirety as a matter of law;
that no valid contract was formed incorporating such terms and
conditions as a matter of law; and that there existed no valid agreement
to arbitrate.
 
The trial court also granted GPB’s motion for partial summary judgment.
FAA and TAA
As a threshold matter, we must determine whether the Federal Arbitration Act
(“FAA”) or the Texas General Arbitration Act (“TAA”), or both, governs this suit. 
The FAA preempts all otherwise applicable state laws, including the TAA, under the
Supremacy Clause of the United States Constitution. U.S. Const. art. VI; see Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 272, 115 S. Ct. 834, 838 (1995). The
FAA applies to contracts involving interstate commerce. 9 U.S.C. § 2. It requires
only that interstate commerce be involved or affected. Allied-Bruce, 513 U.S. at
277–81, 115 S. Ct. at 841–43. Interstate commerce is evidenced by location of
headquarters in another state, manufacture of components in a different state,
transportation of goods across state lines, and billings prepared in another state,
among other factors. Stewart Title Guar. Co. v. Mack, 945 S.W.2d 330, 333 (Tex.
App.—Houston [1st Dist.] 1997, writ dism’d w.o.j.); see also Robinson v. TCI/US
West Commc’ns Inc., 117 F.3d 900, 904 (5th Cir. 1997) (defining interstate commerce
as “trade, commerce, transportation, or communication among the several States, or
between any foreign county and any place or ship outside thereof”). The burden is
on the party seeking to compel arbitration to establish its right under the FAA. Ikon
Office Solutions, Inc. v. Eifert, 2 S.W.3d 688, 696 (Tex. App.—Houston [14th Dist.]
1999, no pet).
Here, the arbitration clause provided that the FAA applied to the transaction. 
The transactions dealt with the sale of engines that were manufactured by MTU
Detroit Diesel, a Michigan corporation, using parts that were manufactured by
Honeywell International, Inc. and its subsidiaries, which are New Jersey
corporations.


 The engines were intended to be used in U.S. and territorial waters. 
Because the provision in question specifically provides that the FAA applies and this
contract involves or affects interstate commerce, we determine that the FAA applies
in this case. See Allied-Bruce, 513 U.S. at 277–81, 115 S. Ct. at 841–43; Stewart
Title Guar., 945 S.W.2d at 333.
At the time this mandamus was filed, mandamus was proper to address a failure
to compel arbitration under the FAA. See In re Merrill Lynch Trust Co., 235 S.W.3d
185, 188 (Tex. 2007) (“[M]andamus relief is appropriate if the trial court abused its
discretion in failing to stay the litigation and compel arbitration.”); see also Zuffa,
LLC v. HDNet MMA 2008 LLC, 262 S.W.3d 446, 449 (Tex. App.—Dallas 2008, no
pet.) (“A party seeking relief pursuant to the FAA from the trial court’s denial of
arbitration or a stay of litigation must file a petition for writ of mandamus.”). 



Accordingly, we dismiss Stewart & Stevenson’s interlocutory appeal for lack of
jurisdiction and consider its petition for writ of mandamus.


Motion to Compel Arbitration
          In its first issue, Stewart & Stevenson argues that the trial court erred in
denying its motion to compel arbitration. Specifically, it argues that the trial court
abused its discretion in finding that the terms and conditions on the reverse side of
the invoices were unenforceable, that no valid contract was formed incorporating
such terms and conditions, and that no valid agreement to arbitrate existed. Stewart
& Stevenson argues (1) that a valid agreement to arbitrate existed between it and
GPB; or, alternatively, (2) that GPB agreed to a modification of the agreement by
accepting the engines accompanied by the terms and conditions in the invoices;
(3) that the course of dealing between the parties created an implied contract, or
(4) that GPB ratified the arbitration provision in the invoices by accepting the
engines.
          A. Standard of Review
          Mandamus issues only to correct a clear abuse of discretion or the violation of
a duty imposed by law when there is no other adequate remedy by law. Walker v.
Packer, 827 S.W.2d 833, 839 (Tex. 1992). Thus, evaluating whether mandamus
relief should be granted requires that we determine whether there has been a clear
abuse of discretion by the trial judge and whether an adequate appellate remedy
exists. Id.
          A party seeking to compel arbitration under the FAA must establish that there
is a valid arbitration agreement and that the claims raised fall within that agreement’s
scope. In re Kellogg Brown & Root, Inc., 166 S.W.3d 732, 737 (Tex. 2005); J.M.
Davidson, Inc. v. Webster, 128 S.W.3d 223, 227 (Tex. 2003). We review the trial
court’s determination as to the validity of an arbitration agreement de novo. J.M.
Davidson, 128 S.W.3d at 227. Under the FAA, ordinary principles of state contract
law determine whether there is a valid agreement to arbitrate. In re Kellogg Brown
& Root, 166 S.W.3d at 738 (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S.
938, 944, 115 S. Ct. 1920, 1924 (1995)). Although there is a strong presumption
favoring arbitration, that presumption arises only after the party seeking to compel
arbitration proves that a valid arbitration agreement exists. J.M. Davidson, 128
S.W.3d at 227. Because arbitration is contractual in nature, the FAA generally does
not require parties to arbitrate when they have not agreed to do so. In re Kellogg
Brown & Root, 166 S.W.3d at 738 (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of
Leland Stanford Junior Univ., 489 U.S. 468, 478–79, 109 S. Ct. 1248, 1255 (1989)).
          B. Determination of Existence of Valid Agreement to Arbitrate
          Stewart & Stevenson first argues that GPB only challenges the contract
between them as a whole, and not the arbitration provision specifically, and that the
issue of the validity of the contract as a whole must be determined by an arbitrator. 
Stewart & Stevenson cites Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440,
126 S. Ct. 1204 (2006) to support its contention. The Supreme Court held in Buckeye
that the question whether a purportedly usurious contract containing an arbitration
provision was void for illegality was to be determined by an arbitrator. 546 U.S. at
444–46, 126 S. Ct. at 1208–09. Here, GPB is not arguing that the underlying contract
for the sale of engines to GPB is void for illegality, but that no agreement to arbitrate
ever existed. 
          The trial court is charged with determining whether a valid agreement to
arbitrate exists. See In re Kellogg Brown & Root, 166 S.W.3d at 737; see also J.M.
Davidson, 128 S.W.3d at 227 (holding that when party resists arbitration, trial court
must determine whether valid arbitration agreement exists). Additionally, the Texas
Supreme Court has held that “the authority of arbitrators is derived from the
arbitration agreement and is limited to a decision of the matters submitted therein
either expressly or by necessary implication.” Gulf Oil Corp. v. Guidry, 327 S.W.2d
406, 408 (Tex. 1959) (considering arbitrator’s authority to make determinations once
case has been submitted to arbitration); see also In re Kellogg Brown & Root, 166
S.W.3d at 738 (holding that FAA generally does not require parties to arbitrate when
they have not agreed to do so). Therefore, the existence of a valid arbitration
agreement must first be determined by the trial court.
          C. Existence of Valid Agreement to Arbitrate
          Stewart & Stevenson argues that a valid agreement to arbitrate existed between
itself and GPB.
1. Meeting of the Minds
          Stewart & Stevenson refers to its invoices, which contained an arbitration
clause printed on the back, as “Engine Purchase and Service Contracts” and argues
that GPB’s payment of the invoices constituted acceptance of the written agreement
containing the arbitration clause. GPB argues that it never reached a meeting of the
minds with Stewart & Stevenson regarding an agreement to arbitrate.
          The elements of a valid contract are (1) an offer, (2) an acceptance, (3) a
meeting of the minds, (4) each party’s consent to the terms, and (5) execution and
delivery of the contract with the intent that it be mutual and binding. Prime Prods.,
Inc. v. S.S.I. Plastics, Inc., 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002,
pet. denied). The elements of written and oral contracts are the same and must be
present for a contract to be binding. Wal-Mart Stores, Inc. v. Lopez, 93 S.W.3d 548,
555 (Tex. App.—Houston [14th Dist.] 2002, no pet.).
          For an agreement to be enforceable, there must be a meeting of the minds with
respect to its subject matter and essential terms. Id. at 556. The determination of a
meeting of the minds, and thus offer and acceptance, is based on the objective
standard of what the parties said and did. Id. The execution of a contract includes
the performance of all acts necessary to render it complete as an instrument. Verson
Allsteel Press Co. v. Carrier Corp., 718 S.W.2d 300, 303 (Tex. App.—Tyler 1985,
writ ref’d n.r.e.) (per curiam).
          The question of whether a contract contains all the essential terms for it to be
enforceable is a question of law. Beal Banks, S.S.B. v. Schleider, 124 S.W.3d 640,
654 n.8 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). What terms are
material or essential to a contract are determined on a contract-by-contract basis,
depending on the subject matter of the contract at issue. T.O. Stanley Boot Co. v.
Bank of El Paso, 847 S.W.2d 218, 221 (Tex. 1992) (“Each contract should be
considered separately to determine its material terms.”). Three essential elements of
a contract for sale are “(1) the thing sold, which is the object of the contract; (2) the
consideration or price to be paid for the thing sold; and (3) the consent of the parties
to exchange the thing for the price.” John Wood Group USA, Inc. v. ICO, Inc., 26
S.W.3d 12, 20 (Tex. App.—Houston [1st Dist.] 2000, pet. denied).
          The contract in this case, under which Stewart & Stevenson provided specific
engines for GPB, shipped them to GPB, and was paid an agreed-upon purchase price
with funds received in part from TCEQ, consisted of three documents. First was the
TCEQ contract number 582-4-65615-0120, dated August 25, 2004 and signed by
TCEQ and GPB, under which TCEQ agreed to reimburse GPB for up to $445,350
toward the expense of replacing its old engines with new, lower-emission engines. 
This agreement permitted GPB to assign the payments due from TCEQ to the “entity
from which the goods or services were procured,” namely Stewart & Stevenson. GPB
was required “to document that the goods or services were received and that the
payment amount is owed to the entity designated to receive the payment from the
state.” This part of the agreement was made contingent upon TCEQ’s receipt of the
money to fund GPB’s application for the grant.
          The second part of the agreement was TCEQ’s Notice to Proceed, issued to
GPB in mid-September 2004, which served as notice that the condition precedent to
its performance under Contract 582-4-65615-0120 had been fulfilled with its receipt
of the funds for the grant and that GPB could proceed “with any unfinished activities
described in the contract.”
          The final document in the agreement was Stewart & Stevenson’s September
22, 2004 sale quote letter to GPB listing the specifications for the products to be sold
by Stewart & Stevenson to GPB. That letter informed GPB that TCEQ had approved
$445,350 to be paid to Stewart & Stevenson for the project, that the total cost of the
project was $587,626, and that GPB was responsible for the difference, or $142,276,
plus “any amount above and beyond” the $587,626 cost of the project. That letter
was signed by Stewart & Stevenson’s customer representative.
          The agreement contained all terms necessary to a valid and binding contract. 
See John Wood Group USA, 26 S.W.3d at 20 (stating essential elements of contract
for sale are object of contract or thing sold, consideration or price to be paid, and
consent of parties to exchange thing for that price). Its acceptance by all
parties—TCEQ, GPB, and Stewart & Stevenson—was confirmed by the performance
of all under it. The agreement did not contain an arbitration provision.
          The only mention of an arbitration provision is included in the invoices sent
by Stewart & Stevenson pursuant to its already existing agreement to provide goods
and services to GPB in conjunction with its contract for a grant from TCEQ. Under
the facts presented here, these invoices were not individual contracts in and of
themselves—they were acknowledgments detailing that portion of the goods and
services provided by Stewart & Stevenson in performance of its already existing
contract with GPB. See Tubelite v. Risica & Sons, Inc., 819 S.W.2d 801, 804 (Tex.
1991) (holding, under Business and Commerce Code, contract was formed before
“acknowledgments and statements of account” were sent and stating, “The
acknowledgments that followed were not a formal confirmation of parties’ agreement
because they did not contain the terms specifically negotiated and agreed to by the
parties.”). This is not enough to show a meeting of the minds between GPB and
Stewart & Stevenson on the arbitration agreement contained on the back of the
invoices.
          Stewart & Stevenson also argues that GPB’s purchase of the extended
warranties was distinct from its purchase of the engines and that there was a meeting
of the minds regarding the arbitration provision on the invoices documenting the sale
of the extended warranties because GPB accepted and used the warranties subject to
the terms and conditions printed on the invoice. However, the evidence does not
support Stewart & Stevenson’s argument. The purchase of the extended warranties
was not separate and distinct from the purchase of the engines. The warranties
themselves were not included in the mandamus record and they are not alleged to
contain any arbitration provision. Rather, the sale and shipment of the engines and
extended warranties were memorialized on the same invoices. They were purchased
following the payment plan outlined in the agreement between TCEQ, GPB, and
Stewart & Stevenson. We conclude that this does not show a meeting of the minds
between GPB and Stewart & Stevenson to arbitrate on the terms and conditions
contained on the back of the invoices reflecting the purchase of the extended
warranties.



 
2. Modification
          Contract modification is an affirmative defense. Arthur J. Gallagher & Co. v.
Dieterich, 270 S.W.3d 695, 701 (Tex. App.—Dallas 2008, no pet.). Whether a
contract is modified depends on the parties’ intentions and is a question of fact, and
the burden of proving modification rests on the party asserting the modification. Id.
at 702. A contract modification independently must satisfy the traditional
requirements of a contract—there must be a meeting of the minds supported by
consideration. Id.
          Here, the requirements of contract modification are not met because, as we
have already discussed, Stewart & Stevenson never demonstrated that it reached a
meeting of the minds with GPB regarding the addition of an arbitration provision to
their agreement. GPB’s acceptance of the engines and payment for them were all
made under the terms of the existing contract. See id.
3. Course of Dealing
          Furthermore, GPB did not accept the arbitration provision through its
subsequent course of dealing with Stewart & Stevenson.
          An implied-in-fact contract “arises from the acts and conduct of the parties, it
being implied from the facts and circumstances that there was a mutual intention to
contract.” Lopez, 93 S.W.3d at 557 (quoting Haws & Garrett Gen. Contractors, Inc.
v. Gorbett Bros. Welding Co., 480 S.W.2d 607, 609 (Tex. 1972)). A meeting of the
minds is also an essential element of an implied-in-fact contract. Id.; see also City
of Houston v. First City, 827 S.W.2d 462, 473 (Tex. App.—Houston [1st Dist.] 1992,
writ denied) (“The only difference between express contracts and implied contracts
is the character and manner of proof required to establish mutual assent. . . .”). The
court “must look to the conduct of the parties to determine the terms of the contract
on which the minds of the parties met.” Id. (quoting Williford Energy Co. v.
Submergible Cable Servs., Inc., 895 S.W.2d 379, 385 (Tex. App.—Amarillo 1994,
no writ)). For a contract to be valid between parties, it is not necessary that the
agreement be signed by both parties. Hearthshire Braeswood Plaza, Ltd. P’ship v.
Bill Kelly Co., 849 S.W.2d 380, 392 (Tex. App.—Houston [14th Dist.] 1993, writ
denied).
          An implied agreement, whether arising under common law or the Uniform
Commercial Code, exists when the acts of the parties are such as to indicate according
to the ordinary course of dealing and common understanding that there is a mutual
intention to contract. Tubelite, 819 S.W.2d at 804–05 (quoting Preston Farm &
Ranch Supply, Inc. v. Bio-Zyme Enters., 625 S.W.2d 295, 299 (Tex. 1981)); see also
Tex. Bus. & Com. Code Ann. § 1.303(b) (Vernon 2009) (“A course of dealing is a
sequence of conduct concerning previous transactions between the parties to a
particular transaction that is fairly to be regarded as establishing a common basis of
understanding for interpreting their expressions and other conduct.”).
          The Tubelite court addressed a provision providing for payment of interest and
stated:
Acquiescence to the contract by the party to be charged may be implied
from his affirmative actions, such as when he continues to order and
accept goods with the knowledge that a service charge is being imposed
and pays the charge without timely objection. But the mere failure to
object to the unilateral charging of interest, without more, does not
establish an agreement to pay interest between the parties.
 
Id. at 805 (internal citation omitted).
          Here, GPB’s failure to object to Stewart & Stevenson’s unilateral inclusion of
an arbitration provision in an invoice reflecting the goods and services provided
under an already existing contract does not establish an agreement to arbitrate
between Stewart & Stevenson and GPB.


 See id. Nor do GPB’s actions in receiving
the goods and services delivered subsequent to a separate agreement affirmatively
demonstrate its acceptance of the arbitration provision. Furthermore, the invoices
sent from Stewart & Stevenson to GPB for transactions prior to the one undertaken
under the agreement between TCEQ, GPB, and Stewart & Stevenson cannot “fairly
. . . be regarded as establishing a common basis of understanding for interpreting their
expressions and other conduct” because the parties both acknowledge that they had
not previously completed any transactions under a similar contract. See Tex. Bus.
& Com. Code Ann. § 1.303(b).
          Although no Texas courts have addressed the application of a post-contract
course of dealing to enforce an arbitration agreement, other courts have held that
“mere acceptance of and payment for goods does not constitute an acceptance of all
the terms,” including an arbitration provision, contained in a seller’s acknowledgment
form. See PCS Nitrogen Fertilizer, L.P. v. Christy Refractories, L.L.C., 225 F.3d 974,
979–80 (8th Cir. 2000). Some other courts have allowed a course of dealing to
establish an agreement to arbitrate, but only when arbitration of disputes was a well-established custom within the industry. See In re Cotton Yarn Antitrust Litig., 505
F.3d 274, 279–80 (4th Cir. 2007); see also Chelsea Square Textiles, Inc. v. Bombay
Dyeing & Manufacturing Co., 189 F.3d 289, 296–97 (2d Cir. 1999) (“We believe that
a textile buyer is generally on notice that an agreement to purchase textiles is not only
likely, but almost certain, to contain a provision mandating arbitration in the event of
disputes, and must object to such a provision if it seeks to avoid arbitration.”). Given
that the parties had already executed a written contract governing this sales
transaction that contained no arbitration provision and that they had no prior course
of dealing under a similar contract, we decline to hold that the post-contract course
of dealing between the parties served to put GPB on notice that its acceptance of and
payment for goods under the existing contract with TCEQ and Stewart & Stevenson
would subject it to mandatory arbitration in the event of a dispute. This is particularly
so when Stewart & Stevenson sent the invoices containing the reference to arbitration
under its arbitration program after it delivered the goods.



4. Ratification
          Nor did GPB ratify the arbitration provision in the invoices. “Ratification
occurs when a party recognizes the validity of a contract by acting under it,
performing under it or affirmatively acknowledging it.” Zieben v. Platt, 786 S.W.2d
797, 802 (Tex. App.—Houston [14th Dist.] 1990, no writ). Here, GPB did none of
those things to ratify the arbitration provision on the back of Stewart & Stevenson’s
invoices. As we have already discussed, the invoices themselves in this case were
acknowledgments of delivery, and GPB’s actions in accepting goods and services
pursuant to a prior agreement with Stewart & Stevenson are not enough to show
affirmative acceptance of terms and conditions not negotiated between the parties.
          5. Incorporation by Reference
          Finally, Stewart & Stevenson argues that the invoices were incorporated by
reference in the January 31, 2006 hand-written agreement between GPB and Stewart
& Stevenson reflecting the “total invoiced amount” of $505,356.
          The doctrine of incorporation by reference allows that “an unsigned paper may
be incorporated by reference in the paper signed.” Owen v. Hendricks, 433 S.W.2d
164, 166 (Tex. 1968). “[T]he language used is not important provided the document
signed by the defendant plainly refers to another writing.” Id. Generally, “any
description, recital of fact, or reference to other documents puts the purchaser upon
inquiry, and he is bound to follow up this inquiry, step by step, from one discovery
to another and from one instrument to another,” until he obtains “complete
knowledge” of all of the matters referred to. Westland Oil Dev. Corp. v. Gulf Oil
Corp., 637 S.W.2d 903, 908 (Tex. 1982) (citing Loomis v. Cobb, 159 S.W. 305, 307
(Tex. Civ App. 1913, writ ref’d)). However, some restrictions on the reference do
exist. The incorporated document must be referenced by name. Gray & Co. Realtors,
Inc. v. Atl. Hous. Found. Inc., 228 S.W.3d 431, 436 (Tex. App.—Dallas 2007, no
pet.).
          Here, the very general reference to “invoiced amounts” is not enough to
describe the referenced provisions sufficiently to put GPB on notice that the terms of
the agreement between it, TCEQ, and Stewart & Stevenson were being supplemented
by the terms and conditions on the invoices. See id.; see also Weber v. Hall, 929
S.W.2d 138, 143 (Tex. App.—Houston [14th Dist.] 1996, orig. proceeding) (holding
that policy “of resolving doubts in favor of arbitration may not serve to stretch a
contract beyond the scope intended by the parties”). We hold that the hand-written
January 31, 2006 agreement did not incorporate the terms and conditions on the
invoices by reference.
          We conclude that the trial court did not err in finding that no valid arbitration
agreement existed between Stewart &Stevenson and GPB, and, therefore, it did not
abuse its discretion in denying the motion to compel arbitration.
          D. Arbitration of Claims Against MTU Detroit Diesel
          Finally, Stewart & Stevenson argues that MTU Detroit Diesel is also a proper
party to arbitration because GPB is suing both Stewart & Stevenson and MTU Detroit
Diesel based on benefits received under the invoices. However, we have held that the
trial court correctly determined that there was no valid agreement to arbitrate between
Stewart & Stevenson and GPB. Likewise, there is no valid arbitration agreement in
the record that could form the basis of an agreement to arbitrate between MTU and
GPB.
          We overrule Stewart & Stevenson’s first issue.
Hearing and Objections
          In its second issue, Stewart & Stevenson argues that the trial court erred in
failing to conduct an evidentiary hearing on its motion to compel arbitration. Stewart
& Stevenson argues that a hearing was required because of allegedly contradictory
affidavits filed by the parties.



          Texas Civil Practice and Remedies Code section 171.021 allows trial courts to
“summarily determine” the issue of whether to compel a party to arbitrate its claims. 
Civ. Prac. & Rem. Code Ann. § 171.021 (Vernon 2005); Jack B. Anglin Co., Inc.
v. Tipps, 842 S.W.2d 266, 269 (Tex. 1992) (“We hold that the trial court may
summarily decide whether to compel arbitration on the basis of affidavits, pleadings,
discovery, and stipulations.”). However, if the material facts necessary to determine
the proper disposition of a motion to compel arbitration are controverted by an
opposing affidavit or otherwise admissible evidence, the trial court must conduct an
evidentiary hearing to determine the disputed material facts. Jack B. Anglin, 842
S.W.2d at 269.
          Here, Stewart & Stevenson argues that there were opposing affidavits that
required the trial court to conduct an evidentiary hearing. However, none of the
affidavits presented in this case contained material facts necessary to determine the
issue of arbitrability.


 The material facts were presented through the documents
exchanged between the parties, and, without relying on any of the allegedly
contradictory affidavits, we have held that the trial court correctly determined that
there was no valid arbitration agreement between Stewart & Stevenson and GPB. 
Therefore, we conclude that the trial court did not err in failing to hold an evidentiary
hearing. See id.
          We overrule Stewart & Stevenson’s second issue.
          In its third issue, Stewart & Stevenson argues that the trial court abused its
discretion by allowing the use of inadmissible evidence to support GPB’s response
to its motion to compel arbitration. Specifically, Stewart & Stevenson objects to the
affidavits of one of GPB’s representatives. The trial court failed to rule on any of the
objections raised by Stewart & Stevenson, and it likewise failed to rule on Stewart &
Stevenson’s Motion for Ruling on Objections and Reconsideration filed after the trial
court denied the motion to compel arbitration. However, the evidence to which
Stewart & Stevenson objects was not necessary to resolve the only argument properly
before this court, which is the legal question of whether or not a valid agreement to
arbitrate existed between Stewart & Stevenson and GPB. We did not consider this
evidence in reaching our conclusion that no enforceable arbitration agreement existed
between Stewart & Stevenson and GPB; therefore, we do not need to consider
whether the affidavit in question was adequate evidence.
          We overrule Stewart & Stevenson’s third issue.
Conclusion
          We dismiss the interlocutory appeal for lack of jurisdiction and deny the
petition for writ of mandamus.



 

                                                             Evelyn V. Keyes
                                                             Justice
 
Panel consists of Justices Keyes, Hanks, and Bland.