Opinion of
February 23, 2010 Withdrawn; Affirmed and Corrected Opinion filed March 2, 2010.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-08-00019-CV

_______________

 

WTG GAS PROCESSING, L.P., Appellant

 

V.

 

CONOCOPHILLIPS COMPANY, TARGA RESOURCES TEXAS GP LLC,
TARGA RESOURCES, INC., TARGA TEXAS FIELD SERVICES, LP, AND WARBURG PINCUS, LLC,
Appellees

                                                                                                                                               


On Appeal from the 333rd District Court

Harris County, Texas

Trial Court Cause No. 2005-77919

                                                                                                                                               


 

C O R R E C T E D  O P I N I O N

We withdraw our opinion of February 23, 2010 and substitute
this corrected opinion in its place.








This suit arises from appellee, ConocoPhillips Company=s (AConocoPhillips@), sale of a natural-gas processing
facility to appellees, Targa Resources Texas GP LLC, Targa Resources, Inc.,
Targa Texas Field Services, LP, and Warburg Pincus, LLC (collectively ATarga@),[1]
instead of appellant, WTG Gas Processing, L.P. (AWTG@).  WTG sued ConocoPhillips for
breach of contract, fraud, and negligent misrepresentation and Targa for
tortious interference with contract or prospective business relationship.  The
trial court granted separate motions for summary judgment filed by
ConocoPhillips and Targa and signed a final judgment that WTG take nothing on
all its claims.

In two issues, encompassing numerous sub-issues, WTG contends
the trial court erred by granting summary judgment on the breach-of-contract
claim against ConocoPhillips and the tortious-interference-with-contract claim
against Targa.  WTG challenges the grounds on which the trial court explicitly
granted summary judgment.  Both ConocoPhillips and Targa present cross-points,
contending the summary judgments should be upheld on alternative grounds, which
were denied by the trial court.  As explained below, we agree with a
cross-point raised by both ConocoPhillips and Targa, and, therefore, affirm the
final judgment.

I.  Background[2]

 WTG is a limited partnership which owns midstream
natural-gas gathering and processing systems.  In 2003, ConocoPhillips decided
to sell several of its natural gas processing plants and pipelines, including
San Angelo Operating Unit (ASAOU@), Louisiana Operating Unit (ALOU@), and Southeast New Mexico assets (ASENM@).  ConocoPhillips engaged Morgan
Stanley & Co., Incorporated (AMorgan Stanley@) to conduct the sale. 








Morgan Stanley issued a ATeaser,@ inviting interested parties to
potentially bid on an individual asset or certain assets combined.  After WTG
signed a confidentiality agreement, Morgan Stanley gave WTG a Confidential
Information Memorandum (ACIM@), which described the assets in more detail and outlined the
progressive steps of the transaction process:  interested parties submit a
non-binding Indication of Interest (AIOI@) containing requisite items; Morgan
Stanley and ConocoPhillips will evaluate the IOIs and invite a limited number of
bidders to attend a management presentation,  participate in due diligence,
receive further information, including a draft Purchase and Sale Agreement (APSA@), and attend a site visit from which
to submit bids; and upon evaluation of the final bids, Morgan Stanley will
narrow the number of bidders and enter into final PSA negotiations.  The CIM
also provided in pertinent part:

Morgan Stanley and
ConocoPhillips reserve the right to . . . negotiate with one or more parties at
any time and . . . enter into preliminary or definitive agreements at anytime
and without notice or consultation with any other parties. Morgan Stanley and ConocoPhillips
also reserve the right, in their sole discretion, to reject any and all final
bids without assigning reasons and to terminate discussions and/or negotiations
at any time for any reason or for no reason at all.        

After submitting an IOI for SAOU, WTG was invited to, and
did, participate in the next stage of the process.  Then, on October 30, 2003,
via letter, Morgan Stanley invited WTG to submit a binding proposal and
outlined the requirements for such a bid (Athe bid procedures@).  The proposal was required to
include ConocoPhillips=s draft PSA marked by WTG to show its proposed changes. 
Among other provisions, the bid procedures contained the following language:

!       
A Proposal will only be deemed to
be accepted upon the execution and delivery by ConocoPhillips of a [PSA(s)].








!       
[ConocoPhillips] expressly
reserves the right, in its sole discretion and at any time and for any reason,
to exclude any party from the process or to enter into negotiations or a
[PSA(s)] with any prospective purchaser or any other party . . .  and to reject
any and all Proposals for any reason whatsoever . . . . [ConocoPhillips] also
expressly reserves the right to negotiate at any time with any prospective
purchaser individually or simultaneously with other prospective purchasers . .
. .  None of ConocoPhillips, its affiliates, representatives, related parties
or Morgan Stanley will have any liability to any prospective purchaser as a
result of the rejection of any Proposal or the acceptance of another Proposal
at any time.

!       
Until the
[PSA(s)] for this transaction is executed by ConocoPhillips and a purchaser,
[ConocoPhillips], its affiliates and related parties shall not have any
obligations to any party with respect to the contemplated transaction, and
following such execution and delivery, the only obligations of ConocoPhillips,
its affiliates and related parties will be to the other party to the [PSA(s)],
and only as set forth therein.

By letter dated November 19, 2003, WTG submitted a Afinal binding bid@ of $135.4 million for SAOU A[i]n accordance with the [CIM] . . .
and the [bid procedures].@ WTG subsequently increased its bid to $145.4 million after
being informed that its offer was lower than others under consideration but
ConocoPhillips was more comfortable with WTG because of fewer changes needed to
its PSA and the parties= past relationship.  WTG was then informed by Morgan Stanley
that it likely would be the winning bidder if it increased its bid to $148.4
million to make it comparable to another offer ConocoPhillips was considering.
On December 10, 2003, WTG increased its bid to $148.4 million.

According to the deposition testimony of Dave Freeman (WTG=s employee who was its principle
contact for the transaction), on December 11, 2003, Garrett Rychlik
(ConocoPhillips=s Coordinator of Business Development responsible for
managing the auction of SAOU), Robert Friedsam (Morgan Stanley), and Ryan Engle
(Morgan Stanley), telephoned Freeman stating the following: ConocoPhillips had
decided to Ago forward with@ WTG; ConocoPhillips and WTG had a Adeal,@ ConocoPhillips had some Aimmaterial@ changesCAwording@ issuesCto WTG=s draft PSA; the parties would Aproceed to get it signed@; and ConocoPhillips would forward a
revised version the next day or at least by December 15.








At that point, WTG=s draft PSA was not in executable
form and did not, among other omissions, fully describe the assets to be
purchased or include all exhibits.  WTG and ConocoPhillips did not thereafter
engage in any negotiations relative to a PSA, ConocoPhillips made no counter
proposal, and these parties never executed a PSA.

Meanwhile, in November and early December of 2003, Targa had
submitted bids for multiple assets, including SAOU, and expressed a strong
preference to make a group purchase.  On December 10, Targa resubmitted a bid
of $335 million for SAOU, SENM, and LOU combined and reiterated its interest in
acquiring several assets in a single transaction.

However, as of December 11, ConocoPhillips had decided to
pursue PSA negotiations with WTG for SAOU, Targa for LOU only, and another
entity for SENM.  During the days immediately following the December 11th phone
conversation with WTG, several ConocoPhillips employees who were responsible
for various aspects of the sale generated some internal e-mails.  The e-mails
reflected that, although Targa=s single bid was higher than the total separate offers,
ConocoPhillips viewed the separate sales as more optimal than a package sale to
Targa.  The employees discussed the status of the sale in light of this
decision.  Specifically, on December 12, Will Duey wrote William Earnest and Mary
Pearce:

[W]e are moving forward with due diligence and PSA
negotiations with DEFS for SENM, [WTG] for [SAOU] and [Targa] for LOU.  It is
our goal to have PSAs for SENM and [SAOU] mid-January and close both before the
end of February. These dates are subject to both due diligence and HSR
requirements; however, they seem achievable at this point in time. Because of
[Targa=s] requirements LOU is expected to close later . . . .

. . . . 

Morgan Stanley is
notifying the unsuccessful bidders that we are starting down the road with
other parties. 

About two hours later, William Earnest forwarded the message to John Lowe
(a ConocoPhillips vice-president) stating:








fyi - We are going down
the path of 3 sales vs. one transaction with Targa due to closing concerns (new
entity), due diligence requirements and [PSA] markup by Targa. We have done
deals with [WTG] and DEFS before and are more confident of closing with them. .
. .

Later that day, Mary Pearce wrote to Sigmund Cornelius and William
Earnest, warning of a potential Apolitical problem@ due to Targa=s latest bid:

We had already released DEFS and WTG to start due
diligence on SENM and [SAOU], respectively.  We also believe that there is a
high risk that Targa will whittle the price down and WTG will not and DEFS may
not based on our past dealings. When we advised Targa that we would not stop
the due diligence and give them an exclusive on the 3 properties, they become
[sic] upset and threatened to not buy LOU. We do plan to tell them that we want
to work with them on LOU and will give them the opportunity if the negotiations
fall apart with our primaries. If they do not buy LOU - we have other options.

We wanted you to know as
you may hear complaints from Targa. We are committed to obtain the best value
as well as live with our deals.

On December 15, Will Duey e-mailed John Lowe, expressing: 

[Targa] seem[s] to be
fishing for a magic number rather than raising their bid or modifying the PSA
that they marked up.  It seems late to ask them to submit a new PSA as we have
already started due diligence with DEFS and [WTG].  Certainly Targa is a great
option if those deals fall apart.

Then, on December 15, Targa did submit another bid of $255
million for SAOU and LOU combined, recognizing a package purchase which also
included SENM may Ano longer be an option.@  Targa also made some concessions on
terms and guaranteed flexibility relative to negotiating other terms in light
of ongoing discussions with Morgan Stanley which clarified ConocoPhillips=s Akey considerations.@  Morgan Stanley forwarded this
proposal to ConocoPhillips, noting it was a total premium of $22 million over
the existing offers.  ConocoPhillips indicated to Morgan Stanley that this
offer had potential if the parties could negotiate other details.  On December
19, Morgan Stanley informed Freeman that ConocoPhillips was considering another
offer.  








On December 22,  Freeman e-mailed Rychlik (ConocoPhillips)
inquiring about the status of the PSA in light of the December 11th phone
conversation and offering a meeting between the parties= attorneys to discuss the PSA. 
Freeman stated WTG was anxious to conclude this transaction because it was in
the process of purchasing another interdependent facility in the area.  He also
stated that WTG had completed some aspects of due diligence and requested
permission to conduct further due diligence during the first week of January.

On the same day, Engle (Morgan Stanley) responded to Freeman=s e-mail, confirming WTG could
conduct the requested due diligence.  Engle advised that ConocoPhillips=s attorney for the sale process was
on vacation for the remainder of December and could not devote significant time
to the PSA that week, and A[a]s previously mentioned, we believe the two parties are
close enough on the PSA that finalizing that document can be done in an
expedious [sic] fashion (most likely during the week of Jan. 5).@  Also that day, Rychlik confirmed to
Freeman that ConocoPhillips was considering another offer, which included SAOU,
and a decision about the new bid would not likely be made before January. 
Rychlik stated he was not Aplaying games@ with WTG but ConocoPhillips had to consider the other
offer.  Freeman replied that WTG would be Aextremely upset@ if a transaction between WTG and
ConocoPhillips were not consummated because it had offered a Apremium@ for SAOU and the complementary
facility and would be Avery upset@ if ConocoPhillips took the other offer without giving WTG an
opportunity to adjust its bid although it might not do so.  The next day,
Freeman expressed to Morgan Stanley and Rychlik via e-mail that allowing WTG to
continue a brisk pace on due diligence would enable it to sign a PSA Aas soon as the attorneys have
negotiated the agreement.@








Throughout late December 2003 and January and February of
2004, ConocoPhillips negotiated with Targa. During this period, WTG,
ConocoPhillips, and Morgan Stanley continued to communicate, in writing or
orally, regarding the status of the sale.  WTG periodically apprised Morgan
Stanley and ConocoPhillips regarding the status of WTG=s due diligence efforts, and they
kept WTG informed that ConocoPhillips was still evaluating the other offer.  

At one point in early January, Freeman again asked if WTG
would be given the opportunity to revise its bid before ConocoPhillips accepted
the other offer.  Morgan Stanley replied that ConocoPhillips would likely
proceed with the other party if its bid were the best offer but WTG was free to
submit a revised bid before that time.  J.L. Davis, owner of WTG, subsequently
wrote two letters to Morgan Stanley stating WTG would not increase its offer
because it believed the parties had an Aagreement@ on price, the offer was fair, and
WTG had expended considerable resources and made another commitment based on
advice it had been selected to purchase SAOU; expressing Akeen disappointment@ if the sale were not concluded; and
reiterating WTG=s Aexpectation that ConocoPhillips will honor its commitment to
accept our bid.@  

Morgan Stanley then notified WTG that due diligence should be
conducted at its own risk and reminded WTG the bid materials advised that
ConocoPhillips could negotiate with any party until a PSA was signed.  A few
days later, Freeman informed ConocoPhillips and Morgan Stanley that once
certain aspects of due diligence were complete, it would be prepared to Afinalize and sign@ a PSA.  Subsequently, Morgan Stanley
advised Freeman that negotiations with the other party were down to the Acritical stage@ but ConocoPhillips wanted to keep
communications open with WTG as a Agood alternative.@  Morgan Stanley inquired about WTG=s status should ConocoPhillips decide
to proceed with WTG.  Freeman replied that WTG was Abasically down to finalizing the PSA
and verifying volumes.@

On February 28, 2004, ConocoPhillips and Targa executed PSAs
for SAOU and LOU. A few days later, Morgan Stanley informed Freeman that
ConocoPhillips had now executed a Adefinitive agreement.@   The closing for the transaction
with Targa occurred in April 2004. 








In December 2005, WTG sued ConocoPhillips for breach of
contract, fraud, and negligent misrepresentation and Targa for tortious
interference with contract or prospective business relationship. 
ConocoPhillips and Targa each filed a traditional motion for summary judgment
followed by a supplement to the motion.  On October 2, 2007, the trial court
signed a AMemorandum Opinion and Order@ granting both motions for summary
judgment and explaining at length the reasons for its decision.  On October 4,
2007, the trial court signed a final judgment referencing its previous order
and ruling that WTG take nothing on all its claims.  WTG appeals the summary
judgment in favor of both ConocoPhillips and Targa.[3]


II.  Standard of Review

A party moving for traditional summary judgment must
establish there is no genuine issue of material fact and it is entitled to
judgment as a matter of law.  See Tex. R. Civ. P. 166a(c);  Provident
Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215B16 (Tex. 2003).  A defendant moving
for summary judgment must conclusively negate at least one element of the
plaintiff=s theory of recovery or plead and conclusively establish each element of
an affirmative defense.  Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195,
197 (Tex. 1995).  If the defendant establishes its right to summary judgment, the
burden shifts to the plaintiff to raise a genuine issue of material fact.  Id. 
We review a summary judgment de novo.  Knott, 128 S.W.3d at
215.  We take as true all evidence favorable to the nonmovant and indulge every
reasonable inference and resolve any doubts in favor of the nonmovant.  Id.


III.  ConocoPhillips=s Motion for
Summary Judgment

In its first issue, WTG contends the trial court erred by
granting summary judgment in favor of ConocoPhillips on WTG=s breach-of-contract claim.[4]








A.        The Issues

ConocoPhillips moved for summary judgment on two alternative grounds:
(1) WTG cannot prove existence of a valid contract because the evidence
conclusively established there was no meeting of the minds; and (2) the statute
of frauds bars WTG=s claim.[5]   In its
responses, WTG addressed these grounds and also raised a promissory-estoppel
defense to the statute-of-frauds contention.[6]

In its order, the trial court found a genuine issue of
material fact on whether a contract was formed.  However, the trial court
concluded that an enforceable contract did not exist as a matter of law
because there was no writing satisfying the statute of frauds and WTG failed to
present evidence supporting its promissory-estoppel argument.  

On appeal, WTG challenges both conclusions concerning the
statute of frauds.  In addition to arguing that the trial court correctly
concluded the statute of frauds was not satisfied, ConocoPhillips raises two
cross-points.  In one such cross-point, ConocoPhillips challenges the trial
court=s ruling that there was a genuine
issue of material fact on whether a contract was formed.








As discussed below, we agree that, as a matter of law,
ConocoPhillips negated formation of a contract.  Therefore, we need not address
the statute-of-frauds issue and will uphold the summary judgment based on
ConocoPhillips=s cross-point.  See Cincinnati Life Ins. Co. v. Cates, 927
S.W.2d 623, 625B26 (Tex. 1996) (holding appellate court, when reviewing
summary judgment,  should consider all grounds on which the trial court ruled
and the movant preserved for appellate review that are necessary for final disposition
of appeal).[7]

B.        Analysis

To prevail on a breach-of-contract claim, a plaintiff must
prove (1) a valid contract existed between the plaintiff and the defendant, (2)
the plaintiff tendered performance or was excused from doing so, (3) the
defendant breached the terms of the contract, and (4) the plaintiff sustained damages
as a result of the defendant=s breach.  West v. Triple B Servs., LLP, 264 S.W.3d
440, 446 (Tex. App.CHouston [14th Dist] 2008, no pet.).  In its motion for
summary judgment, ConocoPhillips asserted the evidence conclusively negated the
existence of a valid contract because the parties did not have a meeting of the
minds; i.e. offer and acceptance.








Among other elements, a party must prove offer and acceptance
to demonstrate existence of a valid contract.  DeClaire v. G & B
Mcintosh Family Ltd. P=ship, 260 S.W.3d 34, 44 (Tex. App.CHouston [1st Dist.] 2008, no pet.); Wal-Mart
Stores, Inc. v. Lopez, 93 S.W.3d 548, 555B56 (Tex. App.CHouston [14th Dist.] 2002, no pet.). 
A Ameeting of the minds@ is Amerely a mutuality subpart of the
offer and acceptance elements.@  Domingo v. Mitchell, 257 S.W.3d 34, 40 (Tex. App.CAmarillo 2008, pet. denied). 
Although whether the parties intended to be bound is often a question of fact,
it may be determined as a matter of law.  See Foreca, S.A. v. GRD
Devel. Co., 758 S.W.2d 744, 746 (Tex. 1988); John Wood Group USA, Inc.
v. ICO, Inc., 26 S.W.3d 12, 16 (Tex. App.CHouston [1st Dist.] 2000, pet.
denied); see also COC Servs., Ltd. v. CompUSA, Inc., 150 S.W.3d 654, 662B70 (Tex. App.CDallas 2004, pet. denied).

Although a PSA was never executed, WTG contends
ConocoPhillips accepted WTG=s offer during the December 11th phone conversation by
representing that ConocoPhillips had decided to Ago forward with@ WTG, they had a Adeal,@ ConocoPhillips had Aimmaterial@ changes to WTG=s PSA, and Athe parties would Aproceed to get it signed.@[8]

Based on the following provisions in the bid procedures,
ConocoPhillips argues that these oral representations, if any, did not
constitute acceptance of WTG=s offer:

A Proposal will only be deemed to be accepted upon the
execution and delivery by ConocoPhillips of a [PSA].

Until the [PSA(s)] for
this transaction is executed by ConocoPhillips and a purchaser,
[ConocoPhillips] . . . shall not have any obligations to any party with respect
to the contemplated transaction, and following such execution and delivery, the
only obligations of ConocoPhillips . . . will be to the other party to the
[PSA(s)], and only as set forth therein.[9]








In contrast, for two reasons, WTG contends these provisions
did not conclusively negate acceptance of its offer: (1) the fact that the
parties contemplated later execution of a PSA did not necessarily preclude
their informal agreement from constituting a binding contract; and (2) a fact
issue existed on whether ConocoPhillips modified or waived these provisions. 
The trial court seemed to conclude the above-cited provisions might otherwise
have negated that ConocoPhillips orally accepted WTG=s offer, but a fact issue existed on
whether ConocoPhillips waived these procedures.

1.         Bid
Procedures Precluding Acceptance Absent Execution of a PSA

ConocoPhillips cites several cases to support its contention
that the above-cited bid procedures negated any purported acceptance of  WTG=s offer, including John Wood
Group  and COC Services.

In John Wood Group, after negotiating the potential
sale of certain assets, the parties signed a letter of intent containing the
following provision:

15.  Binding Effect.  
This Letter Agreement constitutes a summary of the principal terms and
conditions of the understanding which has been reached regarding the sale of
certain assets to Purchaser . . . .  It does not address all of the terms
and conditions which the parties must agree upon to become binding and
consummated.   The Purchaser, however, does intend to move forward with its
due diligence and expects to expend considerable sums to review the Sellers= Business.  In consideration
therefor, the parties have agreed to make certain covenants of this letter
binding upon the parties notwithstanding the fact that not all details of the
transactions have been agreed upon.  Accordingly, it is understood and
agreed that this letter is an expression of the parties= mutual intent and is not binding
upon them except for the provisions of [several numbered paragraphs].








26 S.W.3d at 15 (emphasis added in original opinion).  The seller refused
to consummate the transaction because of disputes on certain matters and sold
the assets to another company.  Id.  In the prospective buyer=s subsequent suit, a jury found that
the seller breached the letter agreement.  Id. at 16.  The court of
appeals held this issue was improperly submitted to a jury and there was no
contract as a matter of law because the parties unambiguously expressed their
intent not to be bound by the letter agreement except for certain paragraphs.  See
id. at 16B20.

In COC Services, the parties signed a letter of intent
with a form master franchise agreement attached.  150 S.W.3d at 660.  The
letter provided that, if the master franchise agreement were not signed by a
certain date, the letter Awill expire, and neither of the undersigned shall have any
further obligation or liability hereunder with respect to a potential master
franchise or license for the development and operation of the Stores . . . .@  Id. at 663 (emphasis added
in original opinion).  Relying primarily on this language, the court held that,
as a matter of law, the parties did not intend to be bound by the master
franchise agreement which was never completed and executed.  See id. at
665B70.

WTG cites several cases to support its position that the fact
the parties contemplated later execution of a written agreement did not
necessarily preclude their informal agreement from constituting a binding
contract.  For example, in Foreca, the parties initialed a handwritten
document which included several terms concerning the sale of amusement-park
rides and the language, ASUBJECT TO LEGAL DOCUMENTATION CONTRACT TO BE DRAFTED BY
[SELLER=S ATTORNEY].@  758 S.W.2d at 744B45.  Subsequently, the seller sued
the prospective buyer for breach of contract after it refused to purchase the
rides.  Id. at 745.  Relying on the above-quoted language, the buyer
urged that no enforceable agreement was made.  Id.  The Texas Supreme
Court held this language was not conclusive on intent to contract because a
fact question existed on whether the contemplated formal writing was a
condition precedent to contract formation or merely a memorial of an already
enforceable contract.  Id. at 745B46. 








WTG also relies on Murphy v. Seabarge, Ltd., 868
S.W.2d 929, 933 (Tex. App.CHouston [14th Dist] 1994, writ denied), in which a AMemorandum of Understanding@ between partners provided it was Anot intended to be a binding contract@ but an outline of proposals in the
event the partnership filed bankruptcy and thus was subject to Apreparation of appropriate
documentation@ and approval of the bankruptcy court.  When the partnership sued one
partner for taking management fees beyond those authorized by the memorandum,
he relied on the foregoing provision to argue the memorandum was not an
enforceable contract.  Id. at 932B33.   The court held that a fact
issue existed on whether the parties intended to be bound by the memorandum.  Id.
at  933B34.            

The Foreca and Murphy courts recited, and WTG
also relies on, the following well-established general contract principles: (1)
the fact that parties to an informal agreement contemplate a formal writing
does not necessarily prevent formation of a binding contract even if the formal
writing is never drafted and executed; see Scott v. Ingle Brothers Pacific,
Inc., 489 S.W.2d 554, 556 (Tex. 1972) (citing 17 Am. Jur. 2d, Contracts ' 28); and (2) parties may form a
binding contract if they agree on material terms although they leave other
terms open for later negotiation; see id. (quoting 1 Arthur Corbin, Corbin
on Contracts ' 28, at 93B95 (1963)); see also Foreca, 758 S.W.2d at 746 (citing
Scott, 489 S.W.2d at 556); Murphy, 868 S.W.2d at 933 (citing Scott,
489 S.W.2d at 556).

We conclude that John Wood Group and COC Services are
persuasive in the present case and Foreca and Murphy, as well as
the general contract principles recited therein, are distinguishable.  The
ConocoPhillips bid procedures were much more definitive than the Asubject to legal documentation@ language in Foreca.  Instead,
like the pertinent provisions in John Wood Group and COC Services,
the bid procedures unequivocally provided that ConocoPhillips did not intend to
accept an offer, or bear any contractual obligations to another party, absent
execution of a PSA.  Thus, execution of a PSA was clearly a condition precedent
to contract formation and not merely a memorialization of an existing
contract.  See John Wood Group, 26 S.W.3d at 16B19 (stating the Ais not binding@ language in the John Wood Group
letter of intent was more definitive than the language in Foreca and
compelled only the conclusion that the parties did not intend to be bound).








The language disavowing intent to be bound in Murphy
was more emphatic than the pertinent language in Foreca.  See Murphy,
868 S.W.2d at 933.  Nevertheless, the evidence raising a fact issue was the
partner=s admitted partial performance of the
agreement despite his later attempt to disavow an enforceable contract.  Id.
at 932B34; see John Wood Group, 26
S.W.3d at 17 (distinguishing Murphy because its party=s partial performance after agreement
was signed created fact question on intent to be bound despite Ano intent@ provision whereas no such partial
performance occurred in John Wood Group).  In the present case, the
parties did not engage in partial performance; indeed, this dispute arose
because ConocoPhillips sold the facility to another party. 

In fact, the John Wood Group court acknowledged the
general principles recited in Foreca, Murphy, and Scott
when cautioning that a party may risk being contractually bound by a letter of
intent which includes essential terms although it does not contain all
protections for which the parties would ordinarily negotiate or on which due
diligence is incomplete.  See John Wood Group, 26 S.W.3d at 19B20.  ATherefore, a party who does not wish
to be prematurely bound by a letter agreement should include >a provision clearly stating that the
letter is nonbinding, as such negations of liability have been held to be
effective.=@  Id. at 19 (quoting E. Allan Farnsworth, Farnsworth
On Contracts ' 3.8b, at 193 (1990)).  The court stated that the case did
not merely involve missing unessential terms, but whether there was mutual consent
on essential terms.  Id. at 20.  Although the parties may have reached a
preliminary agreement on essential termsCthe item to be sold and the priceCthe seller withheld its consent to be
bound on those agreed‑upon terms until a final purchase agreement was
signed.  Id.  Similarly, ConocoPhillips withheld its acceptance of an
offer until execution of a PSA, despite any preliminary Adeal@ on essential terms made during the
December 11th phone conversation.








We acknowledge that the present case differs from John
Wood Group and COC Services in that the provisions reflecting intent
not to be bound in those cases were contained in a written agreement signed by
both parties.  See John Wood Group, 26 S.W.3d at 15; COC Servs.,
150 S.W.3d at 663.  In this case, the language precluding acceptance of an
offer absent execution of a PSA was contained within the bid procedures
promulgated by ConocoPhillips.  Nonetheless, WTG made its bid A[i]n accordance with the [CIM] . . .
and the [bid procedures].@  WTG argued this language did not necessarily mean it agreed
to the bid procedures, but merely that it was responding to the procedures by
submitting all items required therein.  Although the trial court ultimately
agreed with WTG on the contract-formation dispute, it disagreed with this
point, stating Ait appears the procedures were incorporated into WTG=s offer . . . .@

We agree that, under the plain meaning of A[i]n accordance with,@ WTG submitted its offer subject to
the bid procedures.  See Webster=s Third New Int=l Dictionary 12
(1993) (defining Aaccordance@ to mean AAgreement, Accord@);
Black=s Law
Dictionary 18 (8th ed.
2004) (defining Aaccordant@ to mean AIn agreement@).  Nevertheless, by acknowledging the bid procedures, WTG
knew that ConocoPhillips, at least, had no intent to be bound absent execution
of a PSA.  See Restatement
(Second) of Contracts ' 27 cmt. B (1981) (A[I]f either party knows or has reason
to know that the other party regards the agreement as incomplete and intends
that no obligation shall exist until other terms are assented to or until the
whole has been reduced to another written form, the preliminary negotiations
and agreements do not constitute a contract.@); see also RHS Interests, Inc. v.
2727 Kirby Ltd., 994 S.W.2d 895, 897B99 (Tex. App.CHouston [1st.  Dist.] 1999, no pet.)
(holding there was no contract for purchase of property where buyer stated its
written offer was Anot binding as an agreement unless and until a fully executed
Earnest Money contract is signed,@ but even under buyer=s position that subsequent oral
negotiations replaced this offer, no contract was formed because seller=s response indicated Adeal@ would be consummated only by Aexecution of the binding Purchase and
Sale Agreement.@).

 








2.         Modification or Waiver of Bid Procedures

Next, WTG contends, and the trial court agreed, that the
language at issue in the bid procedures did not conclusively negate acceptance
of WTG=s offer because a genuine issue of
material fact existed on whether ConocoPhillips modified or waived the
procedures.  In support, WTG and the trial court cited another provision in the
bid procedures:

ConocoPhillips reserves the right, without
explanation, to amend, modify or waive the procedures, terms and conditions set
forth herein at any time, with or without sending notice of the waivers or
changes to prospective purchasers.              

Additionally, WTG argued, and the trial court stated, ATexas jurisprudence allows parties to
orally modify a contract even if the contract itself contains language
prohibiting oral modification, if parties agree to disregard this language.@  See Morrison v. Ins. Co. of N.
Am., 69 Tex. 353, 364, 6 S.W. 605, 609 (Tex. 1887); Mar-Lan Indus., Inc.
v. Nelson, 635 S.W.2d 853, 855 (Tex. App.CEl Paso 1982, no writ).@[10]

Relying on the above-cited provision and the general
principle regarding contract modification, the trial court concluded:








It is possible
ConocoPhillips had the requisite intent to form a contract without the added
protection of the bid procedures and, that though the parties still intended to
execute a final agreement, ConocoPhillips forwent such as a requirement and
accepted on the spot, thus waiving the condition precedent by its acceptance. 
Though the proposition that ConocoPhillips did so may seem dubious, this is a
matter for the finder of fact to determine.  Whether intent was present,
acceptance given, and oral agreement made are matters best left to a finder of
fact.  The Court finds that the bid procedures promulgated by ConocoPhillips
did not limit ConocoPhillips= ability to accept WTG=s PSA as it was and at that time for
the purposes of summary judgment. 

WTG also cites authority recognizing a party may waive a
condition it originally imposed as prerequisite to contract formation, although
the trial court did not recite this principle in its order.  See, e.g., Padilla
v. LaFrance, 907 S.W.2d 454, 460B61 (Tex. 1995) (recognizing offer
prescribing time and manner of acceptance must ordinarily be complied with to
create contract, but different method of acceptance may be effectual where
offeror agrees to modification of terms of acceptance). 








Waiver is Aan intentional relinquishment of a known right or intentional
conduct inconsistent with claiming that right.@  Jernigan v. Langley, 111
S.W.3d 153, 156 (Tex. 2003) (per curiam).  Initially, Freeman acknowledged in
his deposition that ConocoPhillips never expressed to WTG it had waived the bid
procedures that precluded acceptance of an offer absent execution of a PSA.
Nonetheless, the fact that ConocoPhillips did not communicate any express
waiver to WTG is inconclusive because ConocoPhillips reserved the right to
unilaterally waive the procedures without informing WTG.  However, WTG also
cites no evidence indicating ConocoPhillips made any express, internal decision
to waive these procedures.[11]  Therefore,
the gist of WTG=s argument, and the trial court=s reasoning, was that a jury might
decide the oral representations during the December 11th phone conversation
themselves constituted ConocoPhillips=s waiver of these bid procedures.  

Consequently, we construe the issue as whether ConocoPhillips
waived the bid procedures through its conduct; i.e. representations which did
not expressly relinquish its rights.  For implied waiver to be found through a
party=s conduct, intent must be clearly
demonstrated by the surrounding facts and circumstances.  Id.; see
Van Indep. Sch. Dist. v. McCarty, 165 S.W.3d 351, 353 (Tex. 2005) (A[T]hat conduct must be unequivocally
inconsistent with claiming a known right.@).  AThere can be no waiver of a right if
the person sought to be charged with waiver says or does nothing inconsistent
with an intent to rely upon such right.@  Jernigan, 111 S.W.3d at
156.  Waiver is ordinarily a question of fact, but when the surrounding facts
and circumstances are undisputed, the question becomes one of law.  Id.
at 156B57.  Considering the surrounding
facts and circumstances, including the purpose of the bid process and
procedures and ConocoPhillips=s actions after the phone conversation, we conclude the oral
representations were insufficient as a matter of law to constitute waiver of
the bid procedures at issue. 

a.         The purpose
of the bid process and procedures

First, allowing a jury to decide the oral representations
alone constituted waiver  would vitiate the purpose of the overall bid process
and the procedures.  The bid procedures provided that one of ConocoPhillips=s Akey objectives@ was Ato obtain the highest possible value@ and it would evaluate proposals Awith the goal of negotiating and
executing a [PSA(s)] with the party that submits the Proposal which best meets
[ConocoPhillips=s] objectives.@  ConocoPhillips=s internal e-mails reflect that the Ahighest possible value@ involved considerations of purchase
price and contract terms.  








Both the CIM and the bid procedures demonstrate they were
intended to ensure that ConocoPhillips achieved its objectives by prescribing
an aggressive, competitive bidding process. ConocoPhillips reserved the right
to pursue the most favorable bid until execution of a PSA by specifying it
could entertain a bid at any time, negotiate with any prospective purchaser at
any time, and negotiate with multiple parties at the same time.

Additionally, arriving at the final terms of a complex,
commercial transaction involves extensive time, effort, research, and finances.
See John Wood Group, 26 S.W.3d at 19.  Further, it is axiomatic that
parties to a complex transaction may need to reach a preliminary agreement in
order to proceed toward execution of a final agreement.  Consequently, parties
may structure their negotiations so that they preliminarily agree on certain
terms, yet protect themselves from being prematurely bound in the event they
disagree on other terms.  See id. (discussing purpose of a letter
of intent).  Indeed, the CIM reflected that ConocoPhillips viewed a preliminary
agreement as different from a PSA because it reserved the right to Aenter into preliminary or definitive
agreements at any time.@  Thus, entering into a preliminary Adeal@ was not necessarily inconsistent
with requiring an executed PSA to form a binding contract.[12]








Accordingly, the bid procedures at issue were intended in
part to protect ConocoPhillips in a situation such as the present dispute; i.e.
prevent an informal, preliminary agreement with a prospective purchaser from
forming a binding contract before execution of the formal writing. 
Consequently, we employ an opposite reasoning to that urged by WTG and adopted
by the trial court: in short, the representations during the December 11th
phone conversation cannot alone constitute waiver of the bid procedures and
acceptance of WTG=s offer when the bid procedures were implemented partly to
prevent such representations from constituting acceptance of an offer. 

Again, we find COC Services, as well as a federal case
cited therein, are illustrative.  In COC Services, the plaintiff buyer
argued that the following conduct by the seller after signing the letter of
intent indicated the parties had entered into a contract although no master
franchise agreement was ever signed: the seller sent potential licensees
materials indicating the master franchise agreement was already binding; the
seller acquiesced in materials the buyer prepared for potential licensees
stating that it Acurrently owns@ a franchise; and the seller=s representative stated in a meeting
that the partners of the buyer were Aowners of right for the franchise.@  COC Servs., 150 S.W.3d at
669.  The court held that the seller=s conduct did not eclipse the other
factors showing lack of intent to be bound absent execution of a master
franchise agreement. Id. at 669B70.         

The COC Services court cited Arcadian Phosphates,
Inc. v. Arcadian Corp., 884 F.2d 69, 72B73 (2nd Cir. 1989), in which the
court concluded that the parties to a memorandum Aagreement@ concerning the sale of certain
assets did not intend to be bound until execution of a formal agreement.  The
court reached this conclusion although the seller, who ultimately refused to consummate
the transaction and disavowed existence of a binding contract, engaged in the
following conduct after signing the memorandum agreement: obtained its board=s approval of the Aproposed agreement@; informed third-parties of an Aagreed-upon@ sale with a Asigned agreement@; referred to the buyer as the Anew owner@; took various steps to consummate
the transaction; and referred to on-going Afinal@ negotiations with an absolute
closing date.  See id. at 71.   








We recognize the COC Services and Arcadian
courts did not use the term Awaiver.@  See generally COC Servs., 150 S.W.3d
654; Arcadian, 884 F.2d. 69.  Nevertheless, their  discussions were
similar to a waiver analysis because the courts refused to disregard the
parties= expression of no intent to be bound
by a preliminary agreement despite one party=s subsequent conduct which might
otherwise have shown acknowledgment of a binding contract.  See COC
Servs., 150 S.W.3d at 669B70; Arcadian, 884 F.2d at 71B77.  Likewise, ConocoPhillips=s representations of a Adeal@ and promise to negotiate and sign a
PSA did not eclipse the bid procedures precluding its  acceptance of an offer
until execution of the PSA.[13] 

b.         ConocoPhillips=s actions after the December 11th
representations

Additionally, ConocoPhillips=s subsequent actions were
insufficient to raise a fact issue on whether the December 11th oral
representations constituted waiver of the bid procedures and acceptance of WTG=s offer.  To the contrary,
ConocoPhillips=s subsequent actions negated that it had waived the procedures and
accepted WTG=s offer. 








In the trial court, WTG emphasized the following statements
in the internal e-mails generated by ConocoPhillips in the days immediately
after the December 11th conversation, discussing the decision to proceed with
WTG for SAOU, as opposed to a package sale to Targa:  AWe are committed to obtain the best
value as well as live with our deals@; and ACertainly Targa is a great option if
those deals fall apart.@ Even if these references to Adeals@ all meant an agreement with WTG, we
employ the same reasoning relative to the e-mails as to the representations in
the phone conversation regarding a Adeal.@[14]  The e-mails indeed indicated
ConocoPhillips had decided at that point to reach a preliminary agreement and
continue negotiations with only WTG for SAOU.  However, they were not
unequivocally inconsistent with ConocoPhillips=s reserving the right to insist on
execution of a PSA as prerequisite to forming a definitive agreement.

Rather, these e-mails reflected ConocoPhillips=s view that it had not yet formed a
binding contract, particularly the references to:

!       
Astarting down the road@ with WTG;

!       
Amoving forward with due diligence and PSA negotiations@;

!       
Agoing down the path@ of
a sale to WTG;

!       
being Amore confident@ of
closing with WTG;

!       
anticipating little risk WTG would
Awhittle the price down@; and   

!       
considering Targa
as an option if Anegotiations@ and a Adeal[s]@ with WTG should Afall apart.@   

Significantly, ConocoPhillips would not have needed to express even the
slightest concern that WTG might Awhittle the price down@ or the deal could Afall apart@ if it believed the parties had
already formed a contract for the amount of WTG=s final bid.

WTG also relied on the December 22nd e-mail from Engle
(Morgan Stanley) to WTG authorizing it to proceed with due diligence and
stating, Awe believe the two parties are close enough on the PSA that finalizing
that document can be done in an expedious [sic] fashion (most likely during the
week of Jan. 5).@  Contrary to WTG=s suggestion, this statement did not
show that ConocoPhillips had accepted WTG=s offer and viewed signing a PSA as
merely a ceremonial step remaining in the process.  In his deposition, Engle
explained that Afinalizing@ meant:

A[T]he two parties would come together
. . . and we were always talking about scheduling aside two or three full days
to negotiate the outstanding terms of the PSA, but . . . who knows when you get
the lawyers in the room negotiating these things, how long that could take, . .
. but there were still at least several days away of negotiation from signing
the PSA. . . . After having negotiated all of the points, finalizing is when
the two sides sign the PSA.








Therefore, the Engle e-mail indicated, at most, that ConocoPhillips
intended to engage in negotiating a PSA, which could then be signed by the
parties, although this process never materialized.  Again, the e-mail was
insufficient to show that ConocoPhillips had relinquished its right to withhold
its acceptance until the PSA was actually signed.

In fact, the following communications of ConocoPhillips and
Morgan Stanley to WTG during late December 2003 and January and February of
2004  negate that ConocoPhillips had waived the bid procedures and accepted WTG
bid before execution of a PSA:

!       
informing WTG that ConocoPhillips
was considering another offer several days before the above-referenced December
22nd e-mail from Engle to WTG;

!       
confirming this fact to WTG on the
same day Engle sent the above-referenced e-mail; 

!       
periodically advising WTG
regarding the status of negotiations with the other party;

!       
reminding WTG that ConocoPhillips
was allowed to negotiate with another party at any time pursuant to the bid
procedures;

!       
telling WTG it was free to submit
a revised bid; and

!       
referring to WTG
as a Agood alternative.@[15]








Finally, we acknowledge the bid procedures were one-sided in
ConocoPhillips=s favor.  In fact, they also provided that ConocoPhillips=s Ainterpretation of the [bid
procedures] shall be final and binding on all parties submitting a Proposal.@  In its summary-judgment response,
WTG asserted that ConocoPhillips Aattempt[s] to have everything its
way, and to give itself free reign to do whatever it pleases, regardless of
what it has said . . . .@  We also acknowledge that, under our reasoning, it would be
difficult for WTG to raise a fact issue on waiver short of an express statement
of waiver by ConocoPhillips, whether communicated to WTG or formulated
internally, or its engaging in partial performance of the contract. 
Regardless, WTG chose to participate in the process knowing ConocoPhillips
precluded its acceptance of a bid, and essentially reserved the right to change
its mind, before execution of a PSA.

In sum, ConocoPhillips proved as a matter of law there was no
meeting of the minds necessary to form a binding contract because it did not
accept WTG=s offer  Accordingly, we sustain ConocoPhillips=s cross-point and uphold the summary
judgment in its favor.

IV.  Targa=s Motion for
Summary Judgment

In its second issue, WTG contends the trial court erred by
granting summary judgment on its cause of action against Targa for tortious
interference with contract.[16]

The elements of tortious interference with contract are (1)
existence of a contract subject to interference, (2) willful and intentional
interference, (3) interference that proximately caused damage,  and (4) actual
damage or loss.  Powell Indus., Inc. v. Allen, 985 S.W.2d 455, 456 (Tex.
1998).  In essence, WTG asserts Targa knew, or should have known, about the
alleged oral contract between WTG and ConocoPhillips and intentionally
interfered by subsequently making a higher offer. 








Targa moved for summary judgment on the following grounds:
(1) WTG=s claim fails because there was no
valid contract between ConocoPhillips and WTG; and (2) WTG cannot prove Targa
knew, or should have known, about any contract between WTG and ConocoPhillips
and, thus, cannot establish intentional interference.  Targa contends it was
simply the highest bidder in a competitive auction process that allowed
ConocoPhillips to consider any bid, and negotiate with any party, before
execution of a PSA.

In its order, the trial court stated that it granted summary
judgment in favor of Targa  on the tortious-interference claim because A[t]he Court has found that no
contract existed between WTG and ConocoPhillips.@  However, as we have discussed, the
trial court actually found a fact issue on existence of a contract but ruled
any such contract was unenforceable under the statute of frauds.  Therefore,
the trial court implicitly denied summary judgment in Targa=s favor on the ground there was no
contract.  We construe the trial court=s ruling on Targa=s motion as concluding the
tortious-interference claim failed because there was no enforceable
contract under the statute of frauds.  The trial court also analyzed Targa=s alternate summary-judgment ground A[i]n the interests of completeness.@  In essence, the court found that
Targa, when submitting the December 15th bid, did not know, and had no duty to
inquire whether, ConocoPhillips had entered into a contract with another party
for sale of the assets and could not be liable for simply making a superior
offer. 

On appeal, WTG challenges both rulings.  Targa presents a
cross-point challenging the trial court=s conclusion that a genuine issue of
material fact existed on whether WTG and ConocoPhillips entered into a
contract.  Because we have concluded there was no contract, we agree that, as a
matter of law, Targa is not liable for tortious interference.  Therefore, we
sustain Targa=s cross-point and uphold the summary judgment in its favor.

We affirm the trial court=s final judgment in its entirety. 

 

 

/s/        Charles W. Seymore

Justice

 

Panel consists of Chief Justice
Hedges and Justices Anderson and Seymore.









[1]  The ATarga@ entities bought the assets, and Warburg Pincus
financed a portion of the purchase.  Because the same claims were asserted
against these defendants, we refer to them collectively as ATarga.@





[2]  The summary-judgment motions, responses, and record
in this case are voluminous.  We set forth only the facts pertinent to our
disposition which nonetheless are somewhat extensive.





[3]  WTG also sued Morgan Stanley, and the trial court
granted summary judgment in its favor, which WTG does not challenge on appeal.





[4]  WTG does not challenge summary judgment on its fraud
and negligent-misrepresentation claims. 





[5]  See Tex. Bus. & Com. Code Ann. ' 26.01(a), (b)(4) (Vernon 2009) (providing that a
promise or agreement for the sale of real property Ais not enforceable unless the promise or agreement, or
a memorandum of it, is (1) in writing;  and (2) signed by the person to be
charged with the promise or agreement or by someone lawfully authorized to sign
for him.@).





[6]  See Nagle v. Nagle, 633 S.W.2d 796, 800 (Tex.
1982) (recognizing courts will enforce oral promise to sign instrument
complying with statute of frauds if (1) promisor should have expected his
promise would lead promisee to some definite and substantial injury, (2) such
injury occurred, and (3) court must enforce promise to avoid injustice). 





[7]  Although we need not address the statute-of-frauds
issue, in essence, WTG maintains (1) a contract was memorialized in writing
through ConocoPhillips=s internal e-mails after the December 11th phone
conversation, together with WTG=s PSA and other
documents relative to the bid process; or (2) alternatively, ConocoPhillips was
estopped to raise the statute of frauds because WTG relied on ConocoPhillips=s promise to sign a PSA when purchasing the
complementary facility, missing an opportunity to buy another property, and
expending funds on due diligence for SAOU.  The trial court concluded that the
December 12th e-mail from Mary Pearce to other ConocoPhillips employees
included the material terms of an oral contract, if any, either in the e-mail
or through incorporation of other documents, and was signed electronically;
however, the e-mail did not include sufficient language of assent to show an
agreement between the parties.  The trial court also rejected the
promissory-estoppel argument because (1) there was no evidence of a promise to
sign a prepared, written agreement that would satisfy the statute of frauds, see
1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital, 192 S.W.3d
20, 29 (Tex. App.CHouston [14th Dist.] 2005, pet. denied); (2) WTG
acquired the complementary facility, forfeited the other purchase opportunity,
and pursued due diligence on SAOU after learning ConocoPhillips was
considering another offer; and (3) evidence indicated WTG would have acquired
the complementary facility regardless of whether it purchased SAOU. 





[8]  ConocoPhillips seemed to dispute WTG=s version of the phone conversation.  In his
deposition, Freeman added details, including ConocoPhillips=s alleged reference to a Adeal@ and Aimmaterial@
PSA changes, that had not been included in WTG=s interrogatory response describing the conversation. ConocoPhillips
also disputed that any proposed changes were Aimmaterial.@  The other evidence relative to our
contract-formation analysis is undisputed because it consists of the documents
relative to the bid process and the parties=
documented or undisputed communications before and after the phone
conversation.  Consistent with our standard of review, we will treat WTG=s version of the phone conversation as correct solely
for summary-judgment purposes because, as explained below, we nevertheless
conclude there was no fact issue regarding contract formation.





[9]  Although these provisions mention Aexecution and delivery@ of a PSA, for ease of reference, we will refer to these steps
collectively as Aexecution@ of
a PSA. 





[10]  Despite ConocoPhillips=s disagreement, the trial court suggested that this general principle
regarding oral modification of an existing contract was applicable to a
question of contract formation. See W. Hatcheries v. Byrd, 218
S.W.2d 342, 343 (Tex. Civ. App.CDallas 1949, no
writ) (APower to modify a pre‑existing contract is
coextensive with the power to initiate it . . . .@ (quoting 10 Tex. Jur. ' 203)). 
ConocoPhillips also notes the full holding of Mar-Lan Industries
referred to oral modification of Aa
written contract not required by law to be in writing.@  635 S.W.2d at 855 (emphasis added).  We need not
decide the extent to which a written contract may be modified by oral agreement
or whether principles regarding contract modification are applicable here
because there is no fact issue on whether ConocoPhillips waived the bid
procedures.





[11]  Garrett Rychlik, ConocoPhillips=s representative who actually participated in the
December 11th phone conversation and was deposed as ConocoPhillips=s corporate representative, expressly testified it did
not Achange those procedures.@  However, in a letter filed before the summary-judgment hearing
regarding the parties= agreements relative to evidentiary objections,
ConocoPhillips=s counsel wrote, ADefendants
are willing to limit their reliance on depositions attached as exhibits to
their briefs to the specific pages of those exhibits cited within those briefs.@  Rychlik=s
entire deposition was attached to ConocoPhillips=s motion for summary judgment, but the above excerpt was not cited in
ConocoPhillips=s summary-judgment filings.  We note the trial court
did not specifically strike all deposition testimony that was not cited in the
parties= briefs.  Nonetheless, even if we disregard the above
excerpt, WTG failed to present any evidence that ConocoPhillips expressly
decided to waive the bid procedures.





[12]  ConocoPhillips did not sign a PSA with WTG because
it received a better offerCnot because the
parties failed to agree on additional terms.  Nonetheless, ConocoPhillips
reserved the right to condition its acceptance on an executed PSA regardless of
the reason it might never be executed.  Further, as the trial court suggested
relative to the statute-of-frauds analysis, despite ConocoPhillips=s purported representations to Freeman on December 11
that its revisions to WTG=s PSA were immaterial, it is unknown whether they
truly would have been immaterial once negotiated.  As the trial court further
recognized, if WTG were unwilling to sign an agreement incorporating ConocoPhillips=s revisions, WTG would likely have been the party
claiming ConocoPhillips never accepted WTG=s
offer.  





[13]  We do not necessarily agree that the language in the
Arcadian memorandum agreement negating contract formation would do so
under Texas law.  Regardless, we do not cite Arcadian relative to the
language sufficient to negate intent to be bound absent a final agreement. 
Rather, we cite Arcadian for the proposition that the seller=s conduct after signing the memorandum agreement was
insufficient to override language that at least the Arcadian court
considered sufficient to negate intent to be bound.





[14]  Relative to the statute-of-frauds issue, the trial
court concluded AWe are committed to . . . live with our deals@ did not clearly mean an agreement with WTG, as
opposed to some other agreement or general Asentiment.@  We will assume solely for purposes of the
contract-formation issue that this statement referred to a preliminary
agreement with WTG because it nonetheless did not raise a fact issue on
waiver.   





[15]  WTG=s post-December
11th communications were somewhat inconsistent regarding whether it believed
ConocoPhillips had accepted WTG=s offer.  On
one hand, Freeman=s asking if WTG would be given the opportunity to
submit a revised bid and urging ConocoPhillips to Anegotiate@
and Afinalize@Cnot
just Asign@Ca PSA indicated
WTG did not view the parties as already having a binding contract for the
amount of its final bid.  Further, WTG cites no portion of the record
reflecting that Freeman insisted ConocoPhillips cease negotiations with the
other party because WTG and ConocoPhillips already had a contract.   On the
other hand, Davis=s letters, stating the parties had an Aagreement@ on
price and WTG had been Aselected@ to
purchase SAOU and urging ConocoPhillips to Ahonor
its commitment to accept our bid,@
arguably support that WTG did view the parties as already having a contract. 
Regardless of WTG=s beliefs, the issue is whether ConocoPhillips waived
the pertinent bid procedures because it reserved the right to unilaterally
change the procedures and was the only party who could do so.





[16]  The record reflects WTG conceded in the trial court
that summary judgment was appropriate on its claim for tortious interference
with business relationship and, on appeal, WTG does not challenge summary
judgment on this claim.